Sam F. Soter and Eva S. Soter v. Commissioner.
Soter v. Commissioner
Docket No. 4016-65.
United States Tax Court
T.C. Memo 1968-43; 1968 Tax Ct. Memo LEXIS 256; 27 T.C.M. (CCH) 194; T.C.M. (RIA) 68043; March 14, 1968. Filed *256 In 1958, Soter sold a 25 percent interest in a partnership to Vopat for $75,000, to be paid in installments. Soter retained a 25 percent interest in the partnership. In his 1958 return, Soter elected to report gain from the sale under the installment method. An amendment to the contract in 1960 caused a dispute between the parties about the method to be followed by Vopat in paying the balance of the contract price. Under the 1960 amendment, Soter reacquired 5 percent of the 25 percent interest (and he then had a 30 percent interest, and Vopat had a 20 percent interest), but the method for his payment therefor to Vopat was not agreed upon 195 until 1962, when their dispute was settled under an agreement of March 8, 1962, which also amended the 1958 contract, which remained in full effect. In 1960, two partners retired leaving Soter and Vopat as the only partners. Their interests automatically became twice as much, Soter, 60 percent, and Vopat 40 percent. In 1960, the partnership business was incorporated. Their interests in the corporation were Soter, 60 percent, and Vopat, 40 percent. In 1962, Vopat sold his 40 percent interest in the corporation to the corporation under an installment *257 contract; and he then assigned to Soter the payments to be made by the corporation. Upon the facts, held: (1) The fair market value of the 5 percent interest reacquired in 1960 by Soter was $15,000. (2) Soter did not realize any taxable income in 1960 under the supplemental agreement of April 7, 1960. (3) In 1962, Soter realized a constructive dividend of $15,000 when his controlled corporation paid that amount to Vopat, which was payment to Vopat for the 5 percent interest reacquired by Soter in 1960. (4) In 1962, Vopat sold his 40 percent interest in the corporation (formerly a 20 percent interest in the original partnership) to the corporation, under a separate, installment contract. He then was obligated to pay Soter $60,000, the balance of the 1958 contract price, and he continued to be so obligated. Under his separate contract with the corporation, the corporation paid Vopat $10,000 in cash, and it became obligated to pay Vopat $50,000 in installments. Vopat paid the $10,000 in cash to Soter, and he assigned the installment payments of $50,000 to Soter, to be paid in the future. (5) In 1962, Soter and Vopat executed an agreement extending the time for Vopat's payment to Soter *258 of the balance payable under the 1958 contract, but the balance was not increased or decreased, and Vopat remained obligated to Soter under the 1958 contract. (6) The 1962 agreement of Soter and Vopat did not constitute a disposition of their 1958 contract within the meaning of section 453(d), 1954 Code, and Soter did not realize the balance of the gain under the contract in 1962. He was entitled to continue to report income from the 1958 contract with Vopat under the installment method. Joseph Jay Bullock, 920 Continental Bank Bldg., Salt Lake City, Utah, for the petitioners. James E. Merritt, for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent determined deficiencies in income tax for 1960 and 1962 in the amounts of $14,697.76 and $12,863.56. The parties have disposed of one issue for 1960, to be given effect under Rule 50. The questions are: (1) Whether in 1960, Sam Soter reacquired from a partner part of the latter's interest in the partnership and if so, whether he realized any ordinary income in 1960, and if so, the amount thereof. (2) Whether in 1962 there was a satisfaction or disposition, within the meaning of section 453(d), 1954 *259 Code, of an installment contract executed October 7, 1958, owing to Soter, resulting in his realization in 1962 of the balance of the unreported gain. Findings of Fact The stipulated facts are so found, and are incorporated herein by reference. The petitioners, residents of Utah, filed jointy returns with the district director of internal revenue in Salt Lake City, Utah. Sam F. Soter is referred to herein as the petitioner. Soter has been engaged in various real estate and construction businesses in Utah for over 20 years. He is the president and controlling shareholder of Soter's, Inc., the business of which includes real estate and construction. He has engaged in the development of several real estate subdivisions in and near Salt Lake City, sales of real estate, and the construction of homes and business structures. The issues relate to a partnership known as Summit Park Company, which became a corporation having the same name in June, 1960. The business of the partnership and, later, of the corporation was the acquisition and the development of a residential subdivision in Parleys Canyon, east of Salt Lake City, called Summit Park, and the sale of the lots for the construction *260 of homes. The original Summit Park partnership was formed in 1956. It acquired and held 196 land and sold lots in the Summit Park subdivision; it made the subdivision improvements; it constructed a few model homes; and sold lots to purchasers who, in turn, built homes. Sales of lots were made for small down payments and subsequent installment payments. The partners in the original partnership in 1956 were Soter, Wayne Christofferson, David Gardner, and Louis Gardner, each having a 25 percent interest. In 1958, Soter acquired Christofferson's interest and then had a 50 percent interest. On October 7, 1958, Soter and Donald Vopat entered into a written contract whereby Soter sold a 25 percent interest in the partnership to Vopat. The basis to Soter of this particular 25 percent interest is $25,410.65. [1] The selling price was $75,000, to be paid $10,000 as the down payment, $20,000 in 4 annual installments of $5,000 each on October 7 of 1959, 1960, 1961, and 1962, and the balance of $45,000 was to be paid in one payment on October 7, 1963. Interest of 3 1/2 percent per year was to be paid on the declinning balance. In addition to the stated payments, Vopat was to pay to Soter one half *261 of whatever sums of money the partnership might pay to Vopat (whether partnership earnings, profits or other partnership funds), if any. The additional payments (if any) were to be credited on the purchase price. It was provided also in the installment contract that Soter, upon receipt of the prescribed payments, agreed to execute all papers and instruments necessary to vest title in Vopat to the onefourth interest in the partnership. The contract was an executory, installment contract of sale of a one-fourth interest in the partnership. Under the 1958 contract, Vopat paid $10,000 to Soter on October 7, 1958. He paid the $5,000 installment due on October 7, 1959, on November 5, 1959. Soter reported these payments in his tax returns for 1958 and 1959 under the installment method. The respondent and petitioner are agreed in the matter of the computation of the amount of the parts of each installment which are taxable in each year under that method of reporting income, on the basis of a sale price *262 of $75,000 and Soter's basis of $25,410.65, as follows: 66.12 percent of each installment received represents taxable income in the year of receipt, of which taxable part 50.47 percent represents ordinary income; 27.90 percent represents long-term capital gain; and 21.63 percent represents short-term capital gain. In his returns for 1958 and 1959, Soter reported the installments received, $10,000 and $5,000, as ordinary income and capital gain, as follows; no issue is presented here about each computation in the returns: Ordinary Income
Long-term Gain
Short-term Gain
1958
$1,747.09
$2,738.96
$2,124.21
1959 1,668.54
922.37
715.09
Reported
$3,415.63
$3,661.33
$2,839.30 Total reported in 1958 and 1959 as taxable income: $9,916.26 Vopat did not execute a promissory note in connection with the contract. It was provided in the contract that in the event of Vopat's failure to comply with the terms, or upon his failure to make payments when they became due, Soter could, at his option upon written notice, declare the entire unpaid balance payable, and he could elect to treat the contract "as a note and mortgage and pass title to the Buyer * * * and proceed immediately to foreclose the same." On April 7, *263 1960, Soter and Vopat executed another agreement which related to the respective interests of Soter and Vopat in the partnership and supplemented the contract of October 7, 1958. The second agreement was executed when David and Louis Gardner retired from the partnership. Vopat did not make any further payments under the 1958 contract after the execution of the supplemental agreement in 1960 due to ambiguities in the 1960 agreement, which gave rise to a dispute which was not settled until 1962. The following facts relate to Donald Vopat: Vopat was employed for 18 years by Boise Cascade Company. It is engaged in the business of selling lumber products, has its main office in Boise, Idaho, and has a branch office in Salt Lake City, where Vopat was employed. Vopat became interested in Soter's Summit Park partnership business in October, 1958, while employed by Boise Cascade. Vopat was the merchandise manager of Boise Cascade in Salt Lake City; his salary was $19,600 a year. He resigned from Boise Cascade on May 1, 1959, and became an employee of the Summit Park partnership at a salary of 197 $1,000 a month, $12,000 a year. His duties included managerial and sales activities. Vopat resigned *264 from his employment by Summit Park in June, 1961. The business had been incorporated into a newly formed corporation, also called Summit Park, on June 1, 1960, and Vopat was its vice-president. His salary was still $1,000 per month. The business of Summit Park proved to be slow. Its net receipts did not yield a profit. In the corporation's first tax return, for June 1, 1960, to April 30, 1961, an operating loss of $34,779.24 was reported. After resigning from the Summit Park corporation, Vopat accepted employment in, and moved to, Modesto, California. Thereafter, he did not return to Salt Lake City to resume business activities. He continued his business activities in California, and he is now a resident of Alameda, which is near San Francisco. As of June 1, 1961, when Vopat resigned and left Salt Lake City, he had paid only the total sum of $15,000 under the purchase and sale contract of October 7, 1958, and $60,000 remained unpaid. Between October 7, 1958, and June 1, 1961, the Summit Park business, as a partnership and as a corporation, had not made any distribution of any earnings, profits, or funds to Vopat as either a partner or a shareholder, apart from his salary. Although *265 Vopat had not paid the full amount for a 25 percent partnership interest, he was recognized as a partner having a 25 percent interest under the October 7, 1958, contract. The other partners, David and Louis Gardner, and Soter, owned a fully-paid 25 percent interest, each. The Gardners entered into an agreement with Soter and Vopat on April 7, 1960, whereby they sold their partnership interests to Soter and Vopat on an installment basis; each one sold his 25 percent interest for $75,000, or $150,000 for their combined 50 percent interest. In addition, the partnership cancelled a personal note of Louis Gardner having an unpaid balance of $3,115. Sinle the Gardners' interests were 50 percent, the partnership was terminated automatically for tax purposes. See section 708, 1954 Code. The final tax return of the old partnership was for the period January 1 through April 7, 1960. It was understood that the assets and liabilities of the old partnership would be taken over by a new partnership of the same name consisting of Soter and Vopat, "the continuing partners." On April 7, 1960, cash down payments were made to the Gardners totaling $25,000. Louis received $15,000, leaving a balance owing *266 to him of $60,000, and David received $10,000, leaving a balance of $65,000 owing to him. Soter and Vopat borrowed the $25,000 from the Strevell-Paterson Finance Corporation, executing a note (with their wives) in their partnership and individual capacities. Vopat did not contribute any of his own funds. It was provided in the written purchase agreement with the Gardners that the balances of the sums due to the Gardners would be an obligation of the continuing or new partnership, and of Soter and Vopat, the continuing partners, personally. In fact, the continuing or new partnership was to pay each of the Gardners $75,000 for his interest in the old partnership in installments over a period of years. On the books of the continuing partnership accounts were set up as liabilities for the two notes to the Gardners, secured by mortgages on certain assets of the partnership, one note to David for $65,000, and one note to Louis for $60,000, and for the note to the finance company for $25,000. Soter and Vopat executed the notes to David and Louis in their partnership and individual capacities. In substance, the continuing partnership, and later the Summit Park corporation, paid the Gardners *267 for their partnership interests, the payments being made in installments. The corporation also set up as liabilities notes payable accounts for the notes to the Gardners and the finance company. As of April 30, 1961, the corporation carried on its books notes payable to the Gardners totaling $99,408.93. As of April 8, 1960, all of the assets and liabilities of the old partnership were transferred to the new partnership known as Summit Park, or Summit Park Company. The new partnership existed from April 8 through May 31, 1960. As of June 1, 1960, all of the assets and liabilities of the new partnership were transferred to the Summit Park Company, a newly-formed corporation, in exchange for 80,000 shares of stock. [2] The officers were Soter, president, and Vopat, vicepresident. In connection with the retirement of the Gardners from the partnership, Soter and 198 Vopat executed a written agreement between themselves dated April 7, 1960. The entire agreement is as follows: The undersigned, *268 Sam F. Soter and Donald L. Vopat, have this day purchased all of the right, title and interests of W. Louis Gardner and David I. Gardner in and to the Partnership known as Summit Park, a partnership, and the said David L. Gardner and W. Louis Gardner are retiring from said partnership and that the undersigned intend to and hereby agree to continue said partnership under the name and style of Summit Park, a partnership, and it is hereby agreed that the undersigned respectively own the following interest in said partnership and all of its assets: Sam F. Soter, 60%; and Donald L. Vopat, 40%. It is further agreed that the undersigned, Donald L. Vopat, will pay the balance due and owing by him to Sam F. Soter under the terms of that certain agreement dated the 7th day of October, 1958, by and between Sam F. Soter as seller and Donald L. Vopat as buyer (under the terms of which the said Donald L. Vopat purchased a one-quarter (1/4) interest in the Summit Park partnership) by applying sixty percent (60%) of the profits to which he is entitled by reason of his ownership of the forty percent (40%) as foresaid on said obligation as said profits are declared payable by the partnership. The agreement *269 of April 7, 1960, between Soter and Vopat supplemented the contract of October 7, 1958, under which Soter sold Vopat a 25 percent interest for $75,000, to be paid in the manner stated therein. The 1960 agreement meant, in paragraph 1, that Soter reacquired one-fifth of the 25 percent interest sold to Vopat under the 1958 contract, but it was not specifically and clearly stated in the 1960 agreement that Soter would pay Vopat any particular sum for the reacquired 5 percent interest. A dispute arose between them about the meaning and effect of paragraph 2 of the 1960 agreement. Vopat did not make any further payments to Soter under the 1958 contract, as supplemented by the 1960 agreement, until 1962 when the dispute was settled and the ambiguities were resolved in another agreement between Soter and Vopat dated March 8, 1962, referred to hereinafter. Under the April 7, 1960 agreement the respective interests of Soter and Vopat in the partnership were adjusted from 25 percent interests to interests of 30 and 20 percent. These interests automatically became 60 and 40 percent when the other two partners, the Gardners, retired and Soter and Vopat became the only partners. Accordingly, Soter's *270 interest in the second continuing partnership was 60 percent, and Vopat's was 40 percent, whereas their respective interests had been, momentarily, 30 percent and 20 percent. When the Summit Park corporation issued stock, in exchange for the assets and liabilities of the second partnership, on June 1, 1960, Soter and Vopat had the same 60 and 40 percent interests, respectively, in the stock and assets of the corporation. On April 7, 1960, according to the transaction with David and Louis Gardner, the fair market value of a 25 percent interest in the partnership was $75,000, and the fair market value of one-fifth of a 25 percent interest was $15,000, (one-fifth of $75,000 is $15,000, and one-fifth of 25 percent is 5.). The value of one-fifth of 25 percent, the interest which Soter reacquired in 1960 from Vopat, was $15,000, for which Vopat received a payment in 1962 of $15,000, under circumstances set forth hereinafter. The matter of payment to Vopat for the interest reacquired by Soter in 1960 was not agreed upon until March 8, 1962, and remained contingent until then. In 1960, Soter did not realize any income as a result of his April 7, 1960, agreement with Vopat relating to Soter's *271 reacquisition of one-fifth of the 25 percent interest. As is set forth hereinafter, Soter realized income of $15,000 in 1962 with respect to a payment to Vopat of $15,000 on March 8, 1962. When the assets and liabilities of the second partnership were transferred on June 1, 1960, to the succeeding corporation, 80,000 shares of capital stock were "issued" to the two partners, 60 percent to Soter, and 40 per cent to Vopat, and one qualifying share of stock was issued to Fred Finlinson, as follows: 47,998 shares to Soter; 1 share to his wife; 1 share to Finlinson; 31,999 shares to Vopat; and 1 share to his wife. Since Vopat had not completed his payments under the 1958 contract, Soter held the 32,000 shares credited on the corporation's books to the Vopats. On August 1, 1961, Soter filed a complaint against Vopat and his wife in the District Court of Salt Lake County, in which he alleged that under the contracts of October 7, 1958, and April 7, 1960, Vopat was in default on his contract and owed Soter a balance of $60,000, plus interest from April 4, 1960, and that the 199 stock certificates and debentures of the corporation issued to Vopat (and his wife) were subject to a lien for the *272 unpaid balance, plus interest. Soter petitioned for a judgment against Vopat for $60,000, plus interest, plus costs, and for the impressing of a mortgage on the shares of stock and the debentures issued to the Vopats, and for the sale thereof, the proceeds to be applied to payment of the judgment. Vopat and his wife duly filed their answer, a counterclaim, and a cross-complaint. Vopat alleged that the agreement with Soter dated April 7, 1960, had decreased Vopat's interest in the partnership from an interest equal to Soter's interest to a 40 percent interest, as against a 60 percent interest in Soter; and, further, that the 1960 agreement had established an entirely new and different method for making payments to Soter under the contract of October 7, 1958. Vopat contended that paragraph 2 of the April 7, 1960, agreement had modified paragraph 1(b) of the October 7, 1958, contract in the following way; that in lieu of the installments of $5,000 which originally were to be paid on October 7, 1960, 1961, and 1962, ($15,000), and the lump sum of $45,000 which originally would have become due on October 7, 1963, (in full payment of the balance of $60,000), the balance of $60,000 was to *273 be paid by Vopat "by applying sixty percent (60%) of the profits to which he [Vopat] is entitled by reason of his ownership of the forty percent (40%) as aforesaid on said obligation as said profits are declared payable." (The above quotation is from paragraph 2 of the agreement of April 7, 1960.)Vopat admitted that he had refused to pay the balance of $60,000 under the October 7, 1958, contract; but he denied that he was in default on that contract, and he denied that the $60,000, plus interest, was due and owing. In his cross-complaint, Vopat alleged that Soter had acted ultra vires in his control and management of the Summit Park corporation and that Vopat's investment therein as a minority stockholder had been seriously threatened. Vopat petitioned the court to declare the corporation dissolved and to appoint a receiver to liquidate its assets. On November 29, 1961, the District Court entered an order granting summary judgment in Vopat's favor, against Soter. The court held that the April 7, 1960, agreement had provided a new and diflerent method for paying the amounts due to Soter under the October 7, 1958, contract, in that the sole method fo payment in satisfaction of the obligation *274 arising under the contract of October 7, 1958, had become the payment to Soter of 60 percent of the dividend income which Vopat might receive from the corporation (the successor to the partnership). The court, however, reserved to Soter, the plaintiff, the right to amend his complaint within 10 days to seek a reformation of the agreement of April 7, 1960. On December 7, 1961, Soter filed an amended complaint, and the Vopats filed their answer thereto on December 8, 1961. Thereafter, early in 1962, Soter and Vopat settled the dispute out of court. Their settlement was incorporated in an agreement dated March 8, 1962, between Soter and Vopat. On March 8, 1962, the lawsuit in the District Court was dismissed with prejudice on the ground that the matter had been fully compromised and settled. On March 8, 1962, Soter and Vopat executed an agreement, set forth hereinafter, in which they agreed as follows: (1) That it was not intended by the second paragraph of their agreement of April 7, 1960, to change the terms for the payments to Soter totalling $75,000 set forth in paragraph 1 of the contract of October 7, 1958; and that it was only intended that the second paragraph of the April 7, *275 1960, agreement should change only the additional payments (if any) to be made by Vopat under paragraph 3 of the 1958 contract from 50 percent of any profits or dividends received by Vopat to 60 percent of 40 percent of any profits or dividends received by Vopat; and that the provisions for the so-called "additional payments" (if any) by Vopat set forth in paragraph 3 of the 1958 contract and paragraph 2 of the supplemental 1960 agreement were terminated. (2) That the entire terms of the 1958 contract and the 1960 supplemental agreement otherwise were, and were to continue to be, in full force and effect; that the Vopats agreed to abide by all of the terms and conditions of the contract dated October 7, 1958; and that the Vopats' heirs and assigns also would be bound to comply with all of the terms of that contract. (3) That the terms of payment in paragraph 1(b) of the 1958 contract were extended, but were not changed as to the full amount, so that the balance of $45,000, which was to have become payable in one sum on October 7, 1963, would be payable in annual installments of $5,000 beginning on October 7, 1963, and on October 7 of each year thereafter until the entire balance of *276 the principal, together with interest, would be 200 paid in full. This amendment of paragraph 1(b) of the 1958 contract did not change the provision that annual installments of $5,000 would be due and payable on October 7, 1960, 1961, and 1962, and those provisions remained as originally set forth. The agreement of March 8, 1962, did not increase or decrease the total purchase price of $75,000 set forth in the 1958 contract; and it did not increase or reduce the amount of the unpaid balance thereof which had remained unpaid as of October 7, 1960, which unpaid balance was $60,000. (4) Soter waived the interest of 3 1/2 percent during the period April 4, 1960, to March 8, 1962, the period of the dispute with Vopat; but the original interest of 3 1/2 percent per year on the declining balance continued and was not changed. (5) The Vopats gave Soter, as collateral security for their continuing obligation to Soter under the 1958 contract, a first lien on any and all payments which Vopat would receive from a separate contract of sale of their interest in the corporation; and they assigned to Soter all of the payments of principal and interest to become payable to them under that separate *277 sale contract. (6) Soter released the Vopats from all actions and claims except their obligations to Soter under the 1958 contract, as amended. (7) It was mutually agreed that the lawsuit pending in the District Court should be dismissed by stipulation, with prejudice. The material parts and substantially all of the agreement of March 8, 1962, of Soter and Vopat are as follows: 1. That Donald L. Vopat and Lenore Vopat, his wife, jointly and severally, hereby agree to abide by all of the terms, conditions, and agreements set forth in the Agreement dated October 7, 1958 by and between Sam F. Soter as Seller, and Donald L. Vopat as Buyer, and agree that the second paragraph contained in that certain Agreement by and between Sam F. Soter and Donald L. Vopat dated April 7, 1960, was not intended to change the terms of payment to be made to Sam F. Soter by Donald L. Vopat as set forth in paragraphs 1 and 3 of the October 7, 1958 Agreement. 2. That Sam F. Soter, in consideration of the payment to him of the sum of $10,000.00 by Donald L. Vopat and Lenore Vopat, his wife, simultaneous with the execution on this Agreement, receipt of which is hereby acknowledged, agrees as follows: (a) That *278 the aforementioned $10,000 payment represents the October 7, 1960 payment and the October 7, 1961 payment, respectively, due and owing by Donald L. Vopat on that certain Agreement dated October 7, 1958 by and between Sam F. Soter as Seller and Donald L. Vopat as Buyer. (b) That Sam F. Soter hereby waives any and all interest due and owing on that certain October 7, 1958 Agreement by and between Sam F. Soter and Donald L. Vopat as Buyer from April 4, 1960 to the date of this Agreement. (c) That the terms of the aforementioned Agreement of October 7, 1958, have been fully complied with by Donald L. Vopat and Lenore Vopat, his wife, to the date of this Agreement. (d) That the terms of payment in respect to that Agreement of October 7, 1958 by and between Sam F. Soter as Seller and Donald L. Vopat as Buyer shall be extended as hereinafter set forth and paragraph 1(b) of said Agreement shall read as follows: "(b) The balance to be paid in installments as follows: Five Thousand Dollars ($5,000.00), or more, on or before the 7th day of October, 1959, and Five Thousand Dollars ($5,000.00) or more, on or before the 7th day of each October thereafter until the entire balance due on said principal, *279 together with interest shall be paid in full." 3. It is mutually agreed by and between the parties hereto that paragraph 2 of the April 7, 1960 Agreement by the parties hereto was only intended to amend the method of payment of the additional payment required by Donald L. Vopat in accordance with paragraph 3 of the October 7, 1958 Agreement by and between the parties hereto from 50% of the profits or dividends received to 60% of 40% of any profits or dividends received by Donald L. Vopat and it was not the intent of the parties hereto that the method of payment of principal and interest required by paragraph 1 of the October 7, 1958 Agreement hereinabove mentioned be changed or discontinued in any respect. It is hereby mutually agreed that the terms of paragraph 3 of the October 7, 1958 Agreement and the terms of paragraph 2 of the April 7, 1960 Agreement by and between the parties hereto are hereby terminated. 4. That it is mutually agreed that the terms of this Agreement together with the terms of the October 7, 1958 Agreement, the January 2, 1959 Agreement, and the April 7, 1960 Agreement by and btween the parties hereto shall be binding upon the heirs, successors, administrators *280 and assigns of the respective parties hereto. 5. It is mutually agreed by and between the parties that the entire terms of the October 7, 1958 Agreement and the April 7, 1960 Agreement by and between the 201 parties hereto are in full force and effect and are not to be changed except as herein specifically modified. * * * 7. Donald L. Vopat and Lenore Vopat, as collateral security to secure the payment of the hereinabove mentioned sums of money, do hereby grant unto Sam F. Soter, the first lien on any and all payments due and owing to Donald L. Vopat and Lenore Vopat, his wife, pursuant to that certain Agreement by and between Summit Park Company and Donald L. Vopat dated the 8th day of March, 1962, and further agree to authorize said Summit Park Company to pay over to Sam F. Soter any payments of principal or interest due them on said Agreement with Summit Park Company as they become due until the obligation owed by Donald L. Vopat and Lenore Vopat to Sam F. Soter is paid in full. 8. Sam F. Soter hereby agrees to hold Donald L. Vopat and Lenore Vopat, his wife, harmless from any debts or liabilities of Summit Park, a partnership. 9. Each of the parties hereto hereby release and discharge *281 each other from all and all manner of actions, causes of actions, judgments, executions, debts, dues, claims and demands of every kind and nature whatsoever each may have had or now have against the other or any of them EXCEPT as hereinabove specifically set forth or referred to. * * * On March 8, 1962, Vopat entered into a separate agreement with the corporation, Summit Park. This agreement was separate and apart from the agreement of the same date between Soter and Vopat, which related to their executory contract of October 7, 1958, which remained in full force and effect, with which the Vopats agreed to comply. The agreement of Vopat and the corporation provided that: 1. The corporation would purchase from the Vopats their 32,000 shares of stock in the Summit Park Company (and all other interests of the Vopats in the corporation, the other interests not being material to the issue in this case). 2. The corporation would pay to the Vopats $10,000 on the date of the execution of the agreement, which amount represented the two delinquent installments of $5,000, each, which the Vopats owed Soter as of October 7, 1960, and 1961, under their contract of October 7, 1958. 3. That the corporation *282 would pay to the Vopats, in 10 installments of $5,000, each, the total sum of $50,000, together with 3 1/2 percent interest a year on the declining balance; and that the first installment of $5,000 would be paid to the Vopats on October 7, 1962, together with interest, and that thereafter the corporation would pay to the Vopats $5,000 on the 7th day of October in each year thereafter, with interest, until the entire principal amount of $50,000, with interest, had been paid in full. (4) The corporation gave to the Vopats a first lien on its assets to secure the payments totalling $50,000 to be paid under the agreement to them, and it was agreed that in the event of a default by Summit Park Company under the agreement, the Vopats could foreclose the lien in the same manner as any other chattel mortgage, as provided by law. (5) The corporation would pay to the Vopats, also, on the date of the execution of the agreement, $15,000, which represented Vopat's equity in the corporation resulting from Vopat's payments of $15,000 to Soter under their 1958 contract. At the end of the agreement between the Vopats and the corporation, Soter signed a guarantee that the corporation would make the *283 installment payments totalling $50,000 to the Vopats. Soter signed the guarantee as the president and the controlling shareholder of the corporation. The corporation did not execute (in addition to the agreement) any note to the Vopats for $50,000 (or to anyone) to secure its contract obligation to pay that sum to the Vopats in the agreed installments. Under the agreement with the Vopats, the corporation agreed to pay to the Vopats the total sum of $75,000, as follows, $25,000 at the time of the execution of the agreement, and $50,000 thereafter in 10 installments of $5,000 each beginning on October 7, 1962. The corporation paid $25,000 to Vopat on March 8, 1962. Vopat thereupon paid $10,000 to Soter in payment of the 2 delinquent installments of $5,000 each, under their 1958 contract which had become due on October 7, 1960, and 1961. The payment of $10,000 on March 8, 1962, brought Vopat's total payments to Soter under their 1958 contract up to $25,000, and left a balance owing by Vopat to Soter in the amount of $50,000, for which balance Vopat continued to be liable to Soter under the contract of October 7, 1958, as affirmed by their supplemental agreement of March 8, 1962, together *284 with 3 1/2 percent interest per year on the balance. Vopat retained $15,000 of the $25,000 paid to him by the corporation on March 8, 1962. The contract of October 7, 1958, between Soter and Vopat was for the sale by Soter 202 of a 25 percent interest in the original Summit Park partnership. As stated hereinbefore, the parties are agreed that the basis to Soter of that particular 25 percent interest was $25,410.65. For unexplained reasons, Soter and Vopat continued to follow and observe, in their agreement dated March 8, 1962, the original provision of their 1958 contract whereby Soter agreed to sell a 25 percent partnership interest for $75,000, even though by their supplemental agreement dated April 7, 1960, they had agreed to "adjust" their respective 25 percent interests in the original partnership to 30 percent for Soter, and 20 percent for Vopat (which interests were referred to in that agreement as the proportions each would have in the continuing partnership, namely, 60 percent in Soter and 40 percent in Vopat); and even though Soter had reacquired, in effect, under the agreement of April 7, 1960, one-fifth of the 25 percent interest which he had agreed to sell to Vopat, namely *285 a 5 percent interest, for which Soter had not then agreed to reimburse or compensate Vopat in any manner. However, on March 8, 1962, the Summit Park corporation paid to Vopat, an additional $15,000 in cash, under the agreement of March 8, 1962, between the corporation and the Vopats. In substance and reality, this payment of $15,000 represented payment to Vopat for the 5 percent interest (one-fifth of the 25 percent interest) which Soter had reacquired from Vopat under their agreement of April 7, 1960. In substance, this payment of $15,000 by the corporation to Vopat was a payment by the corporation of an obligation of Soter to Vopat. The fair market value on April 7, 1960, of a 5 percent interest in the original partnership was $15,000. (5 percent of $300,000, each 25 percent interest having a value of $75,000.) At that time, each of the Gardners had sold a 25 percent partnership interest for $75,000, and one-fifth thereof had a fair market value of $15,000, which was the value of the one-fifth of the 25 percent interest which Soter reacquired at that time from Vopat, without agreeing to make payment therefor in any amount. In reality, Soter constructively received from the Summit *286 Park corporation on March 8, 1962, a dividend of $15,000 by virtue of the corporation's paying that amount to Vopat. Soter, as the president and controlling shareholder of the corporation, was aware of the corporation's agreement with and payment to Vopat of this $15,000, and of the separate contract of March 8, 1962, between Vopat and the corporation. Under the separate agreement of March 8, 1962, between Soter and Vopat, the time for the payment of the remaining $50,000 under the 1958 contract was extended and was to be paid by Vopat in annual installments of $5,000, plus 3 1/2 percent interest per year, which installments were to become due and payable beginning on October 7, 1962, and on October 7 of each succeeding year until the balance was paid in full. On March 8, 1962, under a letter to the corporation, Vopat assigned to Soter the annual installment payments of $5,000 to be paid by the corporation to Vopat (under the separate agreement between the corporation and Vopat of the same date), beginning on October 7, 1962, which installment payments were to total $50,000. Vopat directed the corporation to pay to Soter the 10 installments of $5,000 per year, together with 3 1/2 percent *287 interest on the declining balance. Ultimate Findings of Fact 1. The Summit Park corporation paid an obligation of Soter in the amount of $15,000 in 1962, which was the fair market value of the 5 percent partnership interest which Soter reacquired from Vopat on April 7, 1960. Soter received from the corporation a constructive dividend of $15,000 in 1962, which is includable as dividend income in his taxable income for 1962. Soter did not realize any income in 1960 with respect to the reacquired interest of 5 percent, since he and Vopat did not agree in 1960 upon the method of payment, if any, by Soter for the reacquired interest of 5 percent. 2. The agreement of March 8, 1962, between Vopat and the corporation was a separate contract of Vopat and the corporation. It did not take the place of or discharge the contract of October 7, 1958, as supplemented on April 7, 1960, and amended on March 8, 1962, between Vopat and Soter, which remained in effect. Soter did not accept the corporation as the obligor, in the place of Vopat, under the contract of October 7, 1958. Vopat's assignment to Soter of the installment payments totalling $50,000, owing by the corporation to Vopat, did not constitute *288 or represent a satisfaction of the October 7, 1958, contract with Soter, under which Vopat remained obligated to Soter. 3. The separate agreement of March 8, 1962, between Vopat and Soter was not 203 a satisfaction and disposition of their contract of October 7, 1958; it only supplemented the 1958 contract; and it did not increase or decrease the principal amount owing by Vopat to Soter, of which the unpaid balance was $50,000, for which Vopat continued to be liable to Soter. The extension of the time for the payment of the balance of $45,000 (of the $50,000) owed by Vopat to Soter, and the provision for the payment thereof in 9 annual installments of $5,000, plus interest, beginning on October 7, 1963, and continuing thereafter until fully paid, instead of the lump sum payment of $45,000 on October 7, 1963, as originally provided, did not constitute a disposition in 1962 of the 1958 installment contrac. Rather, the 1958 installment contract between Vopat and Soter was extended and continued without any substantial modification of the terms thereof, and without releasing Vopat from his obligation to Soter. Soter did not realize in 1962 the balance of the income and gain from the installment *289 contract of October 7, 1958. 4. The payment to Vopat by the corporation of $15,000 on March 8, 1962, on Soter's behalf, for the 5 percent interest Soter had reacquired on April 7, 1960, had the net effect of adjusting retroactively as of April 7, 1960, the property sold by Soter to Vopat to a 20 percent interest for the net selling price of $60,000. But such adjustment between the parties of this continuing installment contract did not constitute a disposition of the contract. Upon the completion of the payments of Vopat's installment obligation to Soter under the 1958 contract, as supplemented and amended on April 7, 1960, and March 8, 1962, Vopat will have paid, and Soter will have received, the net sum of $60,000, after taking into account the retroactive adjustment on March 8, 1962, and Vopat's receipt of $15,000 ($75,000 less $15,000). Beginning with Soter's taxable year 1962, the respective amounts of Soter's basis for tax purposes of the 20 percent interest sold, and of his total gain from the sale thereof for the adjusted sum of $60,000 may affect the gross profit percentage, and the proportions to be used in computing for 1962 and thereafter, the respective amounts of the *290 payments received by Soter which represent in each year ordinary income, long-term capital gain, and short-term capital gain, respectively, under the installment method of reporting the gain and income. [3] Since Soter in reality agreed in 1962 to adjusting the selling price during the period he was receiving payments from the installment sale under the 1958 contract, as supplemented and amended, he must redetermine the "gross profit percentage" to be applied to payments received from the sale in 1962 and thereafter, subsequent to the 1962 adjustment. [4]
Opinion The main question is whether in 1962 there was a disposition of the installment contract of October 7, 1958, between Soter and Vopat, within the meaning of section 453(d), 1954 Code, *291 so that in 1962 Soter was required to report the balance of the gain to be realized from that contract, rather than to continue to report the gain under the installment method, as had been done in Soter's returns for 1958 and 1959. The question is one of fact. Respondent determined that there was a "disposition" of that contract in 1962. He computed the unreported balance of the gain to be the total amount of $25,603.33, and included that amount in Soter's taxable income for 1962. That determination is in issue. Another question is whether under the agreement of April 7, 1960, Soter realized ordinary income in 1960 of $30,873.48 because of the adjustment set forth therein of the partnership interests of Soter and Vopat from 25 percent, each, to 30 percent in Soter, and 20 percent to Vopat (referred to in that agreement as 60 percent in Soter and 40 percent to Vopat). This also is a fact question. Upon consideration of the entire record and the substance of the agreements between Soter and Vopat, and all of the circumstances, it is held that: (1) Soter did not realize ordinary income in 1960 in the amount of $30,873.48. (2) That in 1962, Vopat received payment of $15,000 for the 5 percent *292 interest reacquired by Soter pursuant to the agreement of April 7, 1960, payment for which was not agreed upon until 1962, when the corporation in substance paid an obligation of Soter in that amount, thereby paying a constructive dividend to Soter of $15,000 which is includable 204 in Soter's income for 1962. (3) That the supplemental agreement of March 8, 1962, between Soter and Vopat, in which Soter did not release Vopat from his obligations under the 1958 contract, and Vopat affirmed that he was obligated to Soter under that agreement, as amended, did not constitute a disposition in 1962 of the 1958 installment contract within the meaning of section 453(d); and that Soter is entitled to continue to report the adjusted gain from that contract under the installment method. Under these holdings, the parties will recompute, under Rule 50, the "gross profit percentage" of Soter's gain under the 1958 contract, as amended, to be reported in 1962 and thereafter under the installment method, in order to reflect the reduction of $15,000 in the net sale price of the interest sold by Soter to Vopat, which was reduced in 1960 from 25 to 20 percent. The net effect of that payment, as between *293 Soter and Vopat, will be in the end that Soter will have received the net sum of $60,000 from Vopat, and Vopat in the end will have paid the net sum of $60,000 to Soter. The parties will also recompute the amount of the basis to Soter of his 20 percent interest, which was the adjusted interest sold to Vopat under the installment contract, and, if necessary, they will adjust also the ratios or percentages of the installment payments representing to Soter ordinary income and capital gain from each installment payment in 1962 and thereafter. Soter did not dispose of their 1958 contract in 1962; neither did Vopat. In their separate agreement of March 8, 1962, a supplement to the 1958 contract, they agreed to modify part of paragraph 1(b) of the 1958 contract, so as to have the balance of the purchase price, $45,000, paid in annual installments of $5,000 instead of in a lump sum on October 7, 1963, as originally required, thus extending the time for the completion of the payments. Otherwise they simply affirmed that the 1958 contract remained in full force and effect and that Vopat was liable for payment of the balance of $75,000, namely, $60,000. Soter was to receive no more or less under *294 the 1958 contract as amended in 1962, than he was to have received when the contract was executed. There was no change in the obligor, which continued to be Vopat. While the 1958 contract was in effect and while Soter was entitled to receive the installment payments, the parties agreed in 1960 that the interest sold was 20 not 25 percent, and in 1962, Vopat received $15,000, an adjustment in the contract price, but these adjustments did not constitute a "disposition" of the 1958 contract, which only was amended. Vopat's separate contract of March 8, 1962, with the corporation was a separate contract which enabled Vopat to meet his continuing obligation to Soter under the 1958 contract. If the corporation completed its contract with Vopat and made the agreed payments owing to Vopat, Vopat would then be able to complete his payments to Soter; but if the corporation failed to make all of the agreed payments owing to Vopat, Vopat remained obligated to Soter under their 1958 contract, as amended. Vopat, in his agreement of March 8, 1962, with Soter, assigned to Soter the installment payments to be made by the corporation to Vopat, under the separate agreement of the same date between Vopat *295 and the corporation, and gave Soter a first lien on those payments; but Soter did not agree that the corporation would become the obligor, in the place of Vopat, under their 1958 contract. The corporation did not execute a note for $50,000 to anyone. No significant change was made in the 1958 agreement by the agreement of Soter with Vopat on March 8, 1962. Soter's waiver of interest during the period of the dispute (about the meaning of the agreement of April 7, 1960), i.e., for the period April 4, 1960, to March 8, 1962, did not constitute a disposition of the 1958 contract. The agreement that the balance of $45,000 could be paid in annual installments of $5,000, until paid, rather than in a lump sum in 1963, did not constitute a disposition of the contract, but only extended the time for Vopat's completion of the payments owing to Soter, during which extended period Vopat was still obligated to pay the same rate of interest, 3 1/2 percent, on the declining balance. A mere extension of the time for the payment of an installment contract does not constitute a disposition thereof; neither does an adjustment in the property interest involved with the corresponding adjustment in the *296 contract price. The evidence does not support a finding that Vopat's contract in 1962 with the corporation was not his own separate contract, or that his 1958 contract with Soter was "disposed" of in 1962 within the meaning of section 453(d). See and compare John I. Cunningham, 44 T.C. 103; J. C. Wynne, 47 B.T.A. 731; 205 Rev. Rul. 55-429, 1955-2 C.B. 252; and Rev. Rul. 55-5, 1955-1 C.B. 331. Respondent's reliance on Burrell Groves, Inc., 22 T.C. 1134, affd. 223 F. 2d 526 (C.A. 5, 1955) is misplaced. The facts there were different. There the taxpayer corporation sold orange grove property to its two stockholders, the Burrells, for cash and their promissory notes. The Burrells later resold the property to a partnership which, in payment therefor, issued its promissory notes to the Burrells and to the taxpayer corporation. The corporation then cancelled the old notes of the Burrells and accepted the new notes of the partnership. In holding that there was a disposition of the installment obligations taxable under section 44(d), 1939 Code (the counterpart of section 453(d), 1954 Code), we pointed out that the installment obligations were "disposed of" through "cancellation and satisfaction" *297 in exchange for the receipt of the obligation of the partnership to pay a like amount of principal in different installment amounts at different due dates with a different interest rate secured by the mortgage of a different debtor. Such facts are not present here. The arrangements adopted by Soter and Vopat in the 1962 supplementary agreement were in form and substance consistent with the original terms of the 1958 contract, as modified in 1960, and they were adopted in order to end the lawsuit then pending between Soter and Vopat, which was dismissed. The respondent recognizes the corporation as a valid, independent business entity. Vopat's agreement with the corporation in 1962 was a separate one and it must be recognized. A corporation may validly purchase from a shareholder his interest in the corporation. Vopat's agreement with the corporation enables him to carry out his obligations to Soter under the 1958 contract, but if the corporation should fail in its obligations to Vopat, Vopat nevertheless is obligated to complete his obligations to Soter under their 1958 contract, as amended. Although the facts are somewhat unusual here, a reasonable construction of the various steps *298 taken is that the 1958 contract was not disposed of by Soter or Vopat in 1962. With respect to the respondent's determination for 1960, the findings dispose of the issue relating to that year. The respondent's agent located an adjusting bookkeeping entry, in the accounts of the first partnership, of $30,873.48, from which he concluded that Soter realized income in that amount in 1960. The accountant for the partnership testified at the trial and explained the entry as one that was merely to make a closing adjustment at the time of the retirement of the Gardners. In the light of all of the evidence, that bookkeeping entry is not controlling. Moreover, even if if were held that Soter realized income in 1960, because of the supplemental agreement of April 7, 1960, with Vopat (which we do not hold), the evidence establishes that the fair market value in 1960 of a 5 percent interest in the partnership was not more than $15,000, as petitioner contends, with which we agree. Decision will be entered under Rule 50. Footnotes
1. It is agreed that upon receipt of $75,000, Soter's gain would be $49,589.35. It is also agreed how the reportable gain from installment payments are to be reported under the installment method.↩
2. The corporation issued its debenture notes at some time in the total amount of $47,585.34, and carried them on its balance sheet as a longterm liability. No issue is presented here with respect to them.↩
3. See and compare the proportions used in computing for 1958 and 1959 the amounts of the payments received in each of those years on the basis of 50.47 percent as ordinary income; 27.90 percent as long-term capital gain; and 21.63 percent as short-term capital gain. The parties will work out under Rule 50 such adjustments for 1962, if required. ↩
4. See Document No. 5108 (10-67), Internal Revenue Service, page 15, "Installment and Deferred-Payment Sales."↩