AKIRA KUTSUNAI and RUTH T. KUTSUNAI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kutsunai v. Commissioner
Docket No. 15964-81.
United States Tax Court
T.C. Memo 1983-182; 1983 Tax Ct. Memo LEXIS 605; 45 T.C.M. (CCH) 1179; T.C.M. (RIA) 83182; April 4, 1983. Herbert T. Ikazaki and Richard T. Kaneko, for the petitioners. Arthur A. Oshiro, for the respondent. FAY
MEMORANDUM OPINION FAY, Judge: Respondent determined a deficiency of $6,228 in petitioners' 1976 Federal income tax. After concessions, the issue is whether petitioners may continue to report on the installment basis their pro rata share of a partnership's settlement proceeds arising out of the sale of certain property. All the facts are stipulated and found accordingly. Petitioners, Akira and Ruth T. Kutsunai, resided in Honolulu, Hawaii, when they filed their petition herein. Doctors Hospital (DH) is a limited partnership organized in 1968 to develop a medical complex on 16.217 acres of land held under a long-term lease. The leasehold was located *606 in the Nuuana Valley of Honolulu. Plans for the complex included a 276 room hospital, a nursing home, and related medical facilities. Petitioner, Akira Kusunai, owned a one percent limited partnership interest in DH. DH spent a large sum of money in the beginning stages of development. It conducted feasibility and engineering studies, acquired building permits, and had plans and specifications drafted. Then, on June 6, 1969, DH sold its entire interest in the leasehold to Beverly Enterprises, Inc. (Buyer), a California corporation engaged in the business of operating nursing homes. The purchase price was $2,265,000 payable: [1]
(1) $100,000
cash at closing
(2) $575,000
Buyer's stock at closing [2]
(3) $795,000
Buyer's stock on "opening" of hospital
(4) $265,000
Buyer's stock each year for 3 years
following the "opening".
*607 In 1970 DH received the $100,000 cash and $575,000 worth of Buyer's restricted stock. Since the value of Buyer's stock was $35.25 per share, DH received 16,788 shares. DH properly elected to report gain on the installment basis under section 453. [3]
Building permits for the medical complex were issued on September 9, 1969. [4] After its acquisition of the leasehold development rights, Buyer decided to increase the size of the complex and began substantial revisions in the plans and specifications. In February 1972, property owners adjacent to the complex site filed suit against Buyer to have the building permits revoked. On October 18, 1972, the Circuit Court of the First Circuit, State of Hawaii, entered judgment against Buyer and declared the building permits null and void. On October 22, 1974, the Hawaii Supreme Court affirmed the judgment. After loss of the building permits, development of the land was restricted to residential housing. *608 Therein began a series of lawsuits between DH and Buyer which were consolidated in January 1975 in the United States District Court for the District of Hawaii. Buyer's complaint accused DH and its general partner, Dr. Richard Chang, of fraud and requested, among other relief, damages and rescission of the sales agreement. The complaint of DH requested damages for breach of contract. Pursuant to a written agreement dated October 25, 1975, the parties settled their lawsuit out of court. That settlement provided in pertinent part: (1) Buyer shall pay DH the sum of $1,540,000 as follows: a) $40,000 for 4 months b) $15,000 for 20 months thereafter c) $20,000 for 54 months thereafter (2) Buyer shall reassign the leasehold to DH. (3) All restrictions on Buyer's stock were lifted. [5]
On or about October 1, 1976, Buyer paid $40,000 cash and delivered its secured promissory note of $1,500,000 to DH. If Buyer defaulted on any scheduled payment as set out in the settlement agreement, interest accrued at 12 percent on that amount. In addition, Buyer reassigned the leasehold which at this time had a fair market value of $50,000. Buyer continues to tender installments on the *609 note from time to time and, as of the date of trial, had an outstanding obligation to DH of an amount between $40,000 and $85,000, the exact amount being in dispute. In his notice of deficiency, respondent determined DH was not entitled to report the settlement proceeds on the installment basis. Thus, respondent determined petitioners must include in their gross income their one percent share of the total value of the settlement proceeds. [6]
There is no question DH properly elected to report gain from the 1970 sale of the leasehold on the installment basis. The issue is whether DH is entitled to continue to report the settlement proceeds arising out of a lawsuit in respect of that sale on the installment basis. As the parties agree, resolution of this issue depends on whether there was a "disposition" of the original installment obligation within the meaning of section 453(d). *610 The main dispute between the parties is over the nature of the settlement proceeds. Petitioners claim no disposition occurred because the lawsuit was basically a suit to collect amounts due under the original sales contract and, therefore, the settlement terms merely represent a modification of that contract. Respondent argues the settlement proceeds are compensation to the seller for damages to the leasehold it reacquired from the buyer. As such, respondent argues there has been a disposition of the original installment obligation. We agree with petitioners that the settlement proceeds are basically amounts due under the original sales contract. Under the tax law, it is well-settled that an award for damages takes on the character of the underlying claims. Woodward v. Commissioner,397 U.S. 572 (1970); Roemer v. Commissioner,79 T.C. 398, 405 (1982). After collapse of the proposed complex, Buyer still owed $1,590,000 on the original contract.In the lawsuit that followed, DH's complaint alleged breach of contract. Pursuant to the settlement agreement, *611 Buyer agreed to pay $1,540,000. There is little doubt that, in recognizing its own responsibility for the revocation of the building permits, Buyer agreed to pay an amount consistent with its obligation under the original contract. Thus, we agree with petitioners that the settlement proceeds are basically amounts due under the original sales contract. We reject respondent's argument that the settlement proceeds represent compensation to DH for damages to the leasehold. To be sure, the leasehold was damaged, in a sense, when the change in zoning laws resulted in a reduction of its value. But that loss was not sustained by DH. When the building permits were revoked, DH did not own the leasehold; therefore, DH did not incur the risk of that loss. Thus, DH was not being compensated for that loss.
Section 453 allows a taxpayer to defer gain on the sale of certain property made on the installment basis. In the event of a disposition of such installment obligation, section 453(d) requires the taxpayer to accelerate such gain into the year of disposition. As this Court has noted, the test *612 is a practical one, namely whether there has been a gainful disposition of the installment obligation. Cunningham v. Commissioner,44 T.C. 103, 108 (1965). We do not think there is necessarily a "disposition" of an installment obligation when, in connection with the settlement of a lawsuit, the buyer substitutes a new obligation for his original installment obligation. Certainly, on these facts no disposition would have occurred had the lawsuit proceeded and the court required Buyer to fulfill the original obligation. We see no reason why the result should be different simply because the parties settled their lawsuit. [7]
We recognize there are differences for example in the medium of payment, in payment schedules, and in certain performance obligations which could have had an effect on the original purchase price. Such modifications, however, do not connote *613 a "disposition". See Cunningham v. Commissioner,supra.Neither does the existence of a new note necessarily connote a "disposition". What is important is that the new note is in substance a continuation of the purchaser's obligation under the original contract. The original obligation has not been satisfied or cancelled; it has simply been replaced by a similar orligation. Respondent emphasizes the fact that DH reacquired the leasehold. Respondent states, "One would think it would be fairly obvious that a sale cannot continue if the only subject of the sale were returned to the seller." The point respondent misses is that what subsequently happens to the subject of the sale does not necessarily control. Simply because the subject of the sale may no longer be in existence or is returned to the seller does not necessarily mean that later installment payments are not made on the original sale. The focus must be on whether the installment obligation has been discharged or satisfied. This is not a case where the seller reacquired property through the purchaser's default and the purchaser's obligation is thereby satisfied or discharged. [8] Rather, having been *614 rendered uneless to Buyer, the leasehold was simply reassigned to DH as part of the settlement agreement. The reassignment of the $50,000 leasehold is nothing more than a payment on the installment obligation and must be included in the amount realized in computing 1976 gain. [9]
*615 The general purpose of section 453(d) is to require a taxpayer to report any deferred profits when those profits are realized. Economically speaking, the seller herein is in no better position than before. He still holds an obligation from the same creditor. Under these circumstances, we find the issuance by Buyer of a new note does not constitute a "disposition" of the original installment obligation. Accordingly, DH is entitled to report payments made on the $1,500,000 note on the installment basis. [10]
*616 Having disposed of the central issue in this case, we are presented with an ancillary issue for which a preliminary comment is necessary. The case was submitted fully stipulated under Rule 122. In their opening brief, petitioners addressed one issue, namely, whether they are entitled to report the settlement proceeds on the installment basis. Absolutely no reference was made to any other issue.Respondent, on the other hand, sees the case in an entirely different light. In his opening brief, respondent stated the parties agreed the value of Buyer's stock issued to DH in 1970 should be included in the amount realized in 1970 when restrictions on that stock were lifted. According to petitioners, however, there was no such agreement; on reply brief, petitioners argue none of those shares should be included in their 1976 income. It is apparent the parties have misunderstood each other. Unfortunately, the Court is not privy to what transpired between the parties outside the record, and there is nothing in the record indicating any concessions or purported agreements regarding this issue. In the future, we urge both parties to give more attention to the preparation and submission *617 of future cases to this Court. We also remaind them the Court cannot bind a party to any purported agreement or assertion that is not made part of the record. The final dispute arises out of the manner in which DH reported the original sale in 1970, a year closed by the statute of limitations, and the effect of that reporting position in 1976, the year before the Court. There is no question DH properly elected to report the 1970 sale on the installment basis. Although DH received $575,000 worth of Buyer's restricted stock in 1970 (16,788 shares at $34,25 per share) and disclosed receipt of such stock on its 1970 return, DH included no part of the value of that stock in the computation of its gross profit. As part of the 1976 settlement, all restrictions on the stock were lifted. The issue is whether petitioners are taxable on the value of those shares when the restrictions were lifted in 1976. [11]
The parties agree the aggregate value of those 16,788 shares in 1976 is $31,478; [12] *618 thus, petitioners' share is $314.78. Petitioners contend any gain attributable to those shares should not be recognized in 1976 or anytime thereafter.They argue those shares were received in 1970 and, therefore, 1970 is the proper year of taxation. Petitioners further argue the mere lifting of restrictions does not constitute a taxable event. Respondent contends all 16,788 shares received by DH in 1970 should be taxed in 1976 when the restrictions were lifted. Respondent takes this position even though 905 shares were admittedly transferred to a third party in 1970 and, thus, DH held only 15,883 shares in 1976. Respondent speculates that petitioners did not assign a value to the stock in 1970 due to the restrictions, and now that those restrictions have been lifted, respondent argues the stock should be taxed. Respondent is obviously troubled by the fact that DH never reported the value of these shares in its income, and now he is barred from assessing taxes in 1970 when they should have been reported. Respondent's argument is based on an estoppel theory. Citing Beltzer v. United States,495 F.2d 211, 212 (8th Cir. 1974), respondent argues petitioners owe a *619 "duty of consistency," and that petitioners are maintaining a position inconsistent with the 1970 reporting position of DH. For the following reasons, we hold for petitioners. This Court ordinarily will not decide issues which are not raised by the statutory notice of deficiency unless they are raised in the pleadings or by an amendment to the pleadings. Fox Chevrolet, Inc. v. Commissioner,76 T.C. 708 (1981). As we recently stated, "Time and again this Court has reiterated that we will not consider issues not raised in the pleadings." Rollert Residuary Trust v. Commissioner, 80 T.C.    , at     (March 31, 1983). Moreover, estoppel and its various counterparts such as quasi-estoppel, equitable estoppel, laches, and duty of consistency are affirmative defenses which must be pleaded and proved by respondent. Southern Pacific Transportation Co. v. Commissioner,75 T.C. 497, 833 (1980). *620 Respondent has failed herein to plead estoppel or any theory akin to estoppel. The issue was raised for the first time on brief. In addition, the 1970 Federal tax returns, from which the relevant entries may have a bearing on whether the Commissioner was misled and whether the estoppel defense is available, are not in evidence. See Mayfair Minerals, Inc. v. Commissioner,56 T.C. 82, 88-91 (1971), affd. 456 F.2d 622 (5th Cir. 1972). For the above reasons and in light of the obvious confusion with which the issue was presented, we deny respondent's attempt to recoup any untaxed gain when restrictions on the stock were lifted in 1976. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Each party was also required to perform various obligations under the contract. For instance, other terms included: 1) Buyer agreed to sublease one acre to DH upon which DH agreed to construct a medical office building. Buyer also agreed to lease a convalescent home to be built by DH. 2) The value of Buyer's stock was to be reduced proportionately if and when hospital occupancy dropped below 80%. ↩
2. At all relevant times, Buyer's stock was traded on the American Stock Exchange. The stock received by DH, however, was "investment letter" or "legend" stock since such shares were not registered with the Securities and Exchange Commission. As such, sale of those shares to the public was restricted.↩
3. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue.↩
4. DH applied for the building permits in December 1968. Had such application not been filed before the effective date of the Comprehensive Zoning Code for the City of Honolulu, January 2, 1969, construction of the medical complex would have been prohibited.↩
5. See note 2, supra.↩
6. Petitioners concede the fair market value of the $1,500,000 note is its face amount. In his notice of deficiency, respondent determined the settlement proceeds were taxable as ordinary income.Respondent has since conceded such amounts are taxable as capital gains.↩
7. See Soter v. Commissioner,T.C. Memo. 1968-43↩ wherein no disposition occurred when the original terms of a contract were modified in order to end a lawsuit between the parties to the contract.
8. See Boca Ratone Co. v. Commissioner,86 F.2d 9 (3d Cir. 1936), revg. 31 B.T.A. 1060↩ (1935). 9. Similarly, respondent's reliance on sec. 1.453-5(b), Income Tax Regs., for the proposition that there is a "disposition" by reason of such reacquisition is misplaced. First, by its very terms, the regulation applies only to taxable years beginning before September 3, 1964. Sec. 1.453-5(b)(1), Income Tax Reg.↩ Second, the regulation does not hold there is a "disposition" simply because the property has been reacquired; rather, it deals with the computation of gain on installment obligations which have been satisfied or discharged when property is reacquired by default or repossession. There has been no discharge or satisfaction of an installment obligation in this case. As we have found, the original obligation has simply been replaced by another obligation which represents the same liability on the contract.
10. The parties are in general agreement over the basis of the installment obligation. That basis consists of the following: Basis of Leasehold
$435,632
Selling Costs
6,301
Engineering Costs
50,000
Attorney's Fees
75,000
Total
$566,933
In its 1970 return, DH calculated a gross profit ratio of 80.49 percent. Thus, out of $100,000 cash actually received in 1970, DH reported a gain of $80,490. The remaining $19,510 represents a return of capital. We sustain respondent's position that petitioners may not now compute the basis of that obligation without taking into account the prior return of capital. Accordingly, the basis must be reduced by $19,510. Similarly, we reject petitioner's argument that the basis of the obligation should be increased by $80,490, the amount of gain reported in 1970. That gain does not represent inclusion in income of any part of an outstanding indebtedness. Rather, it represents actual cash payments received by DH. Any basis arising out of the reporting of such gain is accounted for in the cash payments received. The parties will need to readjust the gross profit ratio to reflect the "new condition of things", see Jerpe v. Commissioner,45 B.T.A. 199, 203↩ (1941), such as an increased basis due to certain post-1970 costs.
11. Since the stock was not registered with the Securities and Exchange Commission, public sale of those shares was restricted. See note 2, supra.↩ It is this restriction that was lifted.
12. The value of Buyer's stock had dropped from a high bid price of $43.25 per share on the American Stock Exchange on January 28, 1970, to a high bid price of $1.875 per share on October 1, 1976.↩