*Decision will be entered under Rule 50.*

JOHN I. CUNNINGHAM AND DIANE W. CUNNINGHAM, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

WEAVER CUNNINGHAM AND GWENDOLYN B. CUNNINGHAM, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5118–63, 5119–63. Filed April 27, 1965.

*Arch B. Gilbert, A. E. Brooks,* and *Donald L. Wilson,* for the petitioners.

*Robert A. Roberts,* for the respondent.

TRAIN, *Judge:* Respondent has determined income tax deficiencies for 1960 of $377.98 against John I. Cunningham and Diane Cunningham and $111,710.26 against Weaver and Gwendolyn Cunningham.

The issue is whether petitioners realized a taxable gain on the disposal of certain installment obligations arising from the sale of corporate stock.

#### FINDINGS OF FACT

Most of the facts are stipulated and these are incorporated herein by this reference.

The petitioners in each proceeding are husband and wife and John Cunningham is the son of Weaver Cunningham. Generally, Weaver Cunningham will be referred to hereinafter as petitioner. Petitioners' returns were filed with the district director of internal revenue at Dallas, Tex.

In 1958 petitioner and his son, John, owned all of the 400 issued and outstanding shares of stock of a Texas corporation, West Texas Concrete Products, Inc. Petitioner owned 396 and John 4 shares.

West Texas Concrete Products, Inc. (hereinafter called Products), was a Texas corporation engaged in the manufacture and sale of concrete building material. Products owned 626 shares out of a total of 1,500 shares of another corporation, Permian Sand & Gravel Co., Inc. (hereinafter called Permian), which was engaged in mining stone, sand, and gravel. The other stockholders of Permian were A & B, Inc. (250 shares), John G. Adams (125 shares), and Buster Cole (250 shares). There were 249 shares of treasury stock.

On December 13, 1958, petitioners, pursuant to a "Stock Purchase Agreement and Option" executed December 5, 1958, sold their Products stock to West Texas Materials Corp. (hereinafter called Materials) for $992,000. [1] Petitioner received $12,000 cash and Materials' promissory note in the amount of $970,080. John received a promissory note only in the amount of $9,920. The notes were payable in 40 equal quarterly installments and bore 5-percent interest on the declining balances. Also under the agreement of December 5, 1958, the owners of Permian stock sold all of its shares to Materials. The total amount of the installment notes given in payment for the stock of Products and Permian was $1,215,000.

Products' shares had a cost basis of $87,949.88 to petitioner and $888.88 to John.

Materials was a new corporation formed for the purpose of purchasing the Products and Permian stock. It was capitalized at $1,000.

On December 17, 1958, Materials executed a collateral agreement with petitioners and others in which it pledged the stock of Products and Permian with petitioner, as trustee, to secure the payments of its promissory notes held by petitioners and other stockholders of Products and Permian. All of such shares have since been held by petitioner subject to the security agreement.

Soon after the acquisition of the stock of Products and Permian by Materials, differences arose between petitioner and the other interested parties concerning the management of those corporations. Several lawsuits were filed and others were threatened. As a result, the parties decided that the Products and Permian stock held by Materials would be transferred to another corporation and placed under new management. Thereafter, under an agreement dated October 6, 1960, the stock was transferred to C.H.C., Inc. The agreement provided, in part, as follows:

West Texas Materials Corporation, for and in consideration of the sum of Ten Dollars ($10.00) cash in hand to it paid by C.H.C., Inc. and the express agreement by C.H.C., Inc. that it will assume and timely pay, according to the terms, tenor and effect thereof, the unpaid balance of principal and interest accrued and to

---

[1] Mendin Materials Co. was the designated purchaser in the Dec. 5, 1958, agreement. It assigned its rights to West Texas Materials Corp.

accrue of those certain promissory notes in the aggregate original principal amount of $1,215,000.00 described in that certain Collateral Agreement executed by West Texas Materials Corporation on December 17, 1958, pertaining to the securities hereinafter described, reference to said agreement being here made for all purposes, and further in consideration of the express assumption and agreement of C.H.C., Inc. to timely keep and perform the covenants and obligations on the part of Minden Materials Company set forth and contained in the Stock Purchase Agreement and Option dated December 5, 1958, hereinabove described, and to which reference is here made for all purposes, together with the covenants and obligations on the part of West Texas Materials Corporation set forth in said Collateral Agreement executed December 17, 1958, has Bargained, Sold and Delivered, and by these presents does Bargain, Sell and Deliver, unto the said C.H.C., Inc. for itself, its successors and assigns, all of the authorized, issued and outstanding shares of the capital stock of West Texas Concrete Products, Inc., and its 625 shares of the capital stock of Permian Sand & Gravel Company, Inc. * * *

Petitioner had considered repurchasing the stock himself but was advised by his attorneys that this might effect a disposition of the installment obligations of Materials and an immediate realization of his entire gain on the installment sale.

C.H.C., Inc., was a Texas corporation. Its stock, consisting of 5,000 shares of a par value of $1 each, was owned 1,599 shares by petitioner, 1,700 shares each by John and petitioner's daughter, Ann, and 1 share by P. O. Harbour. Ann was then a college student. P. O. Harbour was a family friend and neighbor of petitioner. He held the office of president of C.H.C., Inc., at petitioner's request, but took no active part in the company's business. C.H.C., Inc., was engaged in the oil and transportation business. It had been in existence for several years.

Sometime subsequent to October 6, 1960, petitioner instructed his accounting firm to make an audit of the books of Products and Permian to ascertain the book value of the companies' stock. A report was submitted December 6, 1960, showing that Products and Permian, as of October 31, 1960, had a combined net worth, "Stockholders' Equity," of $656,534.09.

During 1958 and 1959, petitioner received payments on the principal of Materials' promissory note in the respective amounts of $12,000 and $99,255.97, and in 1959 John received a payment of $979.88. Materials was never in default in its payments on the notes. There were unpaid balances on October 6, 1960, of $797,988.03 on petitioner's note and $8,184 on John's. On that date the fair market value of the 396 shares of Products stock, which petitioner had transferred to Materials, was $525,500. The fair market value of the four shares transferred by John was $5,300.

In an exchange of letters between C.H.C., Inc., and petitioners early in January 1961, certain changes in the payment of the installment obligations of C.H.C., Inc., were agreed to whereby C.H.C., Inc., was

to make quarterly payments to petitioner and John in the respective amounts of $250 and $100 until the installment payments due Adams and Cole were fully satisfied and that thereafter the quarterly payments to petitioner and John would be $15,000 and $150, respectively, until they had received in the aggregate $525,484.08 and $5,307.92, respectively, plus interest. This modification of the installment agreement was said to be for the purpose of adjusting the installment obligations to the then value of the stock transferred to C.H.C., Inc. By a separate letter of the same date, January 4, 1961, petitioner agreed to waive the interest if the installment payments were made by C.H.C., Inc., on or before their due dates.

Respondent determined that petitioner realized a long-term capital gain in 1960 from a disposition of his installment obligation in the amount of $447,378.16, computed as follows:

| | | |
|---|---:|---:|
| Amount realized | | $525,484.08 |
| Total cost of assets originally sold | $87,949.88 | |
| Cost previously recovered | 9,843.96 | |
| Basis of the obligation | | 78,105.92 |
| Gain | | 447,378.16 |

He has further determined that John I. Cunningham realized a capital gain of $4,506.42.

#### OPINION

The sole question at issue is whether there was a disposition by petitioners of their installment obligations resulting in the realization of income, as determined by respondent. The statute involved is section 453(d), I.R.C. 1954, which provides, in material part, as follows:

SEC. 453. INSTALLMENT METHOD.

(d) GAIN OR LOSS ON DISPOSITION OF INSTALLMENT OBLIGATIONS.—

(1) GENERAL RULE.—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and—

(A) the amount realized, in the case of satisfaction at other than face value or a sale or exchange, or

(B) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange.

Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received.

(2) BASIS OF OBLIGATION.—The basis of an installment obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full.

Respondent has determined that the transfer of the stock of Products by Materials to C.H.C., Inc., and the assumption of the installment obligations by C.H.C., Inc., amounted to a disposition by petitioners of

their installment obligations within the meaning of the statute. In support of his determination respondent places chief reliance on *Burrell Groves, Inc.*, 22 T.C. 1134 (1954), affd. 223 F. 2d 526 (C.A. 5, 1955); *Boca Ratone Co.* v. *Commissioner*, 86 F. 2d 9 (C.A. 3, 1936); and *Jack Ammann Photogrammetric Engineers, Inc.*, 39 T.C. 500 (1962), since reversed 341 F. 2d 466 (C.A. 5, 1965).

Petitioners' argument is that the installment obligations were not satisfied but that C.H.C., Inc., merely assumed them without change in the installment contract. It is on these grounds chiefly that petitioners distinguish *Burrell Groves, Inc.*, *supra*.

In the *Burrell Groves, Inc.*, case, the taxpayer corporation sold property, an orange grove, to its two stockholders, Eugene and Alice Burrell, for cash and their promissory notes and reported gain from the sale on the installment basis. The Burrells thereafter resold the property to a partnership which, in payment therefor, issued its promissory notes to the Burrells and to the taxpayer. The taxpayer then canceled the old notes of the Burrells and accepted new notes of the partnership. In holding that this was a disposition of the installment obligations taxable under section 44(d), 1939 Code (the counterpart of sec. 453(d) of the 1954 Code), we pointed out that the installment obligations "were 'disposed of' through cancellation and satisfaction" in exchange for the receipt of the obligation of the partnership "to pay a like amount of principal in different installment amounts at different due dates with a different interest rate secured by * * * mortgage of a different debtor."

In the *Boca Ratone* case, there was a sale of real estate, a default by the purchaser on its promissory notes, a reacquisition of the property by the sellers on their payment of a certain sum to the defaulting purchasers, and a release of the purchasers on their unpaid promissory note. The purchaser had paid $39,375 of a total contract price of $78,750 and the vendors had reported profits of $12,253 on the installment payments. The property had a cost to the vendors of $54,243.99 and a value when repossessed of only $27,122. The court held, reversing the Tax Court (then the Board of Tax Appeals), that the reacquisition of the property by the vendors and the release of the vendees from their obligation on the installment notes, while it constituted a satisfaction of the installment obligation, did not result in any taxable gain under section 44(d).

In the *Jack Ammann Photogrammetric Engineers, Inc.*, case, we held that the corporate taxpayer realized taxable gain on the acquisition from one of its stockholders of its own installment obligation for which it issued to him additional shares of its own stock. On appeal, the U.S. Court of Appeals, Fifth Circuit, held that this was not a "disposition" of an installment obligation by the taxpayer within the meaning of section 453(d),

A case more in point here, we believe, is *J. C. Wynne*, 47 B.T.A. 731 (1942), cited by petitioners. There the taxpayers, husband and wife, sold property to a corporation in which they owned the majority of the stock. The other stockholder was the husband's brother. Approximately 3 years later, the corporation's assets and liabilities were transferred to a partnership composed of the three stockholders and the corporation was dissolved. Among such liabilities was an installment note due the wife for $50,000. We held that the assumption of the obligation by the partnership was not a disposition of the obligation under section 44(d). The obligation, we said, continued with the change of the obligee and that "it is only the disappearance of the installment obligation or its removal from the hands of the obligee that creates the occasion for invoking the provisions of section 44(d)." (47 B.T.A. at 735.)

Respondent argues that there was a disposition of the installment obligation here when petitioners released Materials from further liability thereon in consideration for Materials' transfer of the Products and Permian stock to C.H.C., Inc., and that they constructively received $530,800, the then fair market value of the Products stock.

We see no justification on the facts here for disregarding the corporate entity of C.H.C., Inc. The latter was an operating corporation which had been in existence for several years. Petitioner owned less than one-third of its stock. The other shares were owned equally by his son and daughter. There is no indication that C.H.C., Inc., was used for an improper purpose or as petitioner's alter ego in the transaction under consideration. There is no claim, and no apparent basis for a claim, that the acquisition of Products stock and the assumption of Materials' installment obligations by C.H.C., Inc., were sham transactions.

Our question is a practical one; namely, whether, in sum total petitioners' handling of their Products stock and installment obligations resulted in a gainful disposition of those obligations under section 453(d) of the 1954 Code. We think not. In the end, petitioners had no more or less than they had in the beginning. They were creditors of the same installment obligations. There was a different obligor, it is true, but in both instances the essential underlying security for the obligations was the stock and earning potentials of Products and Permian. Respondent has made no determination of a gain based on the difference between the value of the installment contracts before and after their assignment to C.H.C., Inc.

We do not attach much importance to the fact that in the following year, 1961, the installment agreement was modified. Even if this had occurred at the time C.H.C., Inc., entered the picture, it would not have materially changed the situation. Neither the reduction of the principal amount of installment obligation nor the waiver of interest thereon necessarily connotes a disposition of the obligation.

Petitioners are sustained in their contention that respondent erred in his determination that they realized a gain in the disposition of their installment obligations.

*Decisions will be entered for the petitioners.*