AFFILIATED CAPITAL CORPORATION AND SUBSIDIARIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 38021-84.          Filed May 4, 1987.

---

*Donald W. Geerhart*, for the petitioners.
*Ana G. Cummings*, for the respondent.

FEATHERSTON, *Judge*: Respondent determined a deficiency in the amount of $66,821 in petitioners' Federal income tax for 1972. The deficiency arises from the partial disallowance of a claimed net operating loss carryback from 1975 to 1972 based on respondent's determination that petitioners recognized gain in 1975 from the disposition or satisfaction of an installment obligation. Although recognition of such gain would not be sufficient to cause a deficiency for 1975, it would cause a decrease in the loss carryback. Petitioners here claim expense deductions for 1972 and 1975 which would further affect the amount of the loss carryback from 1975 and the deficiency for 1972. The issues presented for decision are as follows:

(1)Whether petitioners are entitled to deduct as ordinary and necessary expenses amounts expended in 1972 and 1975 for the preparation and filing of post-effective amendments to the original prospectus and registration statement filed

with the Securities and Exchange Commission with respect to stock and warrants first offered for sale to the public in 1970.

(2)Whether installment obligations received by petitioners on the sale of real estate in 1974 were satisfied at other than face value or otherwise disposed of in 1975, causing the recognition of gain for 1975 pursuant to section 453(d).[1]

### GENERAL FINDINGS OF FACT

Petitioner Affiliated Capital Corp. (sometimes hereinafter Affiliated) is the parent corporation of a group of subsidiary corporations that filed consolidated returns for 1972 through 1975. Its principal place of business was in Houston, Texas, when the petition was filed. One of the subsidiary corporations in the group is Center Savings & Loan Association (Center).

### 1. *The Post-Effective Amendments Issue*

On March 26, 1970, Affiliated made a public offering of 525,000 units of securities at a sale price of $20 per unit. Each unit consisted of 2 shares of common stock and one warrant to purchase 1 share of common stock. The proceeds of the offering were to be used to acquire stock in Center and two other savings and loan associations.

The warrants were originally exercisable on June 25, 1970, or such earlier date as might be determined by the underwriters, and were scheduled to expire March 26, 1975. The warrants were later extended to March 26, 1977.

The warrants contained provisions designed to protect their holders against dilution by reason of stock dividends, stock splits, combinations, reclassifications, and the issuance of Affiliated's stock at a price lower than the prevailing warrant purchase price or its issuance of securities convertible into, or evidencing rights to purchase, Affiliated stock at prices below the warrant price.

The costs of the original 1970 offering totaled $982,396.42 consisting of the following:

---

[1]All section references are to the Internal Revenue Code of 1954 in the form effective for 1972 and 1975.

| | |
|---|---:|
| Underwriting commissions | $761,250.00 |
| Audit fees | 86,984.26 |
| Legal fees | 60,000.00 |
| Printing costs | 74,162.16 |
| Total | 982,396.42 |

Of these total original issuance costs, petitioner's accountant allocated 12.1951 percent, or $119,804.22, to the warrants.

In order to offer its stock and warrants for sale to the public, Affiliated was required to file a registration statement in 1970 with the Securities and Exchange Commission (hereinafter the SEC) on Form S-1 pursuant to the provisions of 15 U.S.C. secs. 77e through 77j (1982) (sometimes hereinafter the Securities Act of 1933). This registration statement consists basically of two parts: (1) A prospectus setting forth information relevant to the purchase of the securities and (2) other information used generally by the SEC.

Following the original filing of the SEC registration statement covering the public offering of its stock and warrants, Affiliated was required by the Securities Act of 1933 to file what are called post-effective amendments to that registration statement and prospectus. The purpose of the post-effective amendments is to update the information contained in the registration statement so that it will continue in effect. The post-effective amendments are intended to make information available to warrant holders to assist them in deciding whether to exercise their warrants.

Affiliated incurred expenses in filing post-effective amendments to update its Form S-1 original registration statement. The amounts verified as expended for this purpose in 1972 and 1975 were $48,752.86 and $21,516.78, respectively.

If Affiliated had not complied with the annual updating requirements of the Securities Act of 1933, trading in its warrants could have been suspended by either the stock exchange or the SEC if their exercise price had been less than Affiliated's common stock trading price. In addition, Affiliated would have subjected itself to potential liability to the warrant holders.

## 2. *The Installment Obligation Issue*

In May 1974, Center, as seller, and Bruce G. Gaylor, trustee (Gaylor), as purchaser, entered into three earnest money contracts providing for the sale of three contiguous tracts (designated as tracts A, B, and C, respectively) of land totaling 97.325 acres. The transaction was closed on June 28, 1974, when pursuant to each contract Gaylor made a stated downpayment and gave Center a nonrecourse promissory note. Each note was secured by a vendor's lien on the related tract, and bore interest, which was to be prepaid annually at a rate of 8 percent per annum. Each of the notes called for nine annual payments in stated equal amounts and a final payment of the unpaid balance at the end of the 10th year. The following table shows for each tract the price for which it was sold and the amount of the related note:

| Tract | Price | Note |
|---|---|---|
| A | $511,136.00 | $496,320.00 |
| B | 539,873.00 | 523,688.27 |
| C | 731,916.42 | 726,586.42 |

The notes signed by Gaylor provided that the maker had no personal liability for the payment of the notes and that the holder's sole recourse and remedy was the right to foreclose the lien on the tract to which it pertained.

On the same day, June 28, 1974, Gaylor sold tract A to Robert H. Bye, trustee (Bye), tract B to Robert H. Tennant, trustee (Tennant), and tract C to Herbert V. Hildebrand, trustee (Hildebrand), and closed the transaction simultaneously with the purchase from Center. The consideration for each sale was a downpayment and a nonrecourse promissory note which was made payable to Gaylor and which was secured by a vendor's lien on the related tract. Each note, like the ones signed by Gaylor, dated June 28, 1974, called for nine annual payments in stated equal amounts and a final payment of the unpaid balance at the end of the 10th year. The following table shows for each tract the price for which it was sold, the amount of the related note, and the prepaid interest rate thereon:

| Tract | Price | Note | Interest rate |
|-------|-------|------|---------------|
| A | $561,320.56 | $507,933.40 | 7.75% |
| B | 577,366.65 | 529,936.75 | 7.75 |
| C | 892,773.74 | 854,167.30 | 7.50 |

Each note provided that the maker was not personally liable for the payment of the note and that the holder's sole recourse and remedy was the right to foreclose the lien securing the payment thereof. Each of the three notes payable to Gaylor referred to the June 28, 1974, note executed by Gaylor to Center as the "Existing Note" and to the lien securing it. The liens securing the three notes payable to Gaylor were made subordinate to the liens securing the existing notes. The note signed by Bye contained the following:

The Payee and subsequent holders hereof hereby acknowledge that within the principal balance of this Note is the outstanding principal balance of the Existing Note hereinabove referenced and described. Payee and holder hereof further agree upon accepting delivery of this Note, so long as the Note or lien securing its payment are not in default, to keep such Existing Note and the liens securing its payment current and to comply with the provisions set forth in the Deed of Trust securing the payment hereof, reference to the same being here made for an incorporation.

An identical provision appears in the note signed by Hildebrand. A provision similar in substance, though not identical in terminology, is contained in the note signed by Tennant.

During the early summer of 1975, a dispute arose between Center and Gaylor regarding certain letters of credit which Gaylor furnished as partial security for the payment of his promissory notes to Center. On July 10, 1975, Center brought suit in the State court against Gaylor, the bank that had issued the letter of credit, and others for damages and other relief. On or about July 11, 1975, Gaylor was also given notice of a proposed trustee's sale of tracts A, B, and C.

On July 18, 1975, Gaylor filed a counterclaim alleging that Center had made misrepresentations and breached certain warranties with respect to utilities and taxes on tracts A, B, and C and seeking a temporary injunction to restrain Affiliated from foreclosing Center's deeds of trust

liens on the three tracts. Bye, Tennant, and Hildebrand filed similar suits to enjoin Center and Gaylor from foreclosing their respective liens on tracts, A, B, and C.

On September 2, 1975, the trial judge granted the temporary injunctions sought by Gaylor, Bye, Tennant, and Hildebrand. Center appealed the granting of the temporary injunctions, but, subsequently, reached a settlement with Gaylor, Bye, and Tennant.

Insofar as it is here pertinent, a memorandum of agreement between Center; Gaylor, trustee; Bruce G. Gaylor; and one George H. Reid, dated September 19, 1975, provided for the settlement of the lawsuit subject to the following conditions:

(1) Bruce G. Gaylor, (Trustee) agrees to assign to Center Savings Association the following described notes and liens covering Real Property (Synott Road) in Harris County, Texas:

(a) Herbert V. Hildebrand, Trustee, to Bruce G. Gaylor, Trustee, dated June 28, 1974. ($854,167.30)

(b) Robert C. Bye, Trustee, to Bruce G. Gaylor, Trustee dated June 28, 1974 ($507,933.40).

(c) Robert H. Tennant, Trustee, to Bruce G. Gaylor, Trustee, dated June 28, 1974 ($529,936.75).

(2) As consideration for said notes Center shall release any claims to the $100,000.00 certificate of deposit plus accrued interest at Allied Bank (Bank).

(3) Center shall pay to Bruce G. Gaylor individually $15,000 cash.

(4) Receipt by Center of the principal and interest payments due on June 28, 1975 of the Bye and Tenant [sic] in accordance with the above described promissory notes by September 30, 1975.

(5) Mutual complete releases executed by Center and Gaylor for any claim arising out of the sale of 3 tracts of land (Synott Road) on June 28, 1974.

\* \* \* \* \* \* \*

(12) Center agrees to pay all commissions to Bye and Hildebrand in connection of the sale of the property, and agrees to hold Gaylor, Trustee, entirely harmless in connection with any claim of whatsoever character arising out of or which may be made by Bye, Tennant and Hildebrand in connection with the sales by Gaylor, Trustee of the three separate tracts of land on June 28, 1974.

Under date of September 30, 1975, Gaylor assigned and transferred to Center his Bye, Tennant, and Hildebrand notes and related liens dated June 28, 1974. The assignment provides that it is made "without recourse in any manner upon or against the Assignor for the payment of said notes."

An agreement called a compromise agreement was also entered into by Affiliated, Center, Gaylor, Bye, Tennant, and others. In this agreement, Center and the other parties settled their disputes with respect to taxes and utilities affecting tracts A and B. The parties further agreed:

### III.

Bye and Tennant, his successors and assigns, shall make payment in full of all net principal and interest due on June 28, 1975 in connection with the promissory note to Gaylor for purchase of the property to Center on or before September 30, 1975. Thereafter, Tennant and Bye, his successors and assigns, shall timely make all payments due on his note to Gaylor in connection with the property to Center and all such notes and deeds of trust in connection therewith shall be construed to have substituted for the name of Gaylor wherever it may appear, the name of Center and Center shall have all the rights, privileges and obligations in connection therewith as though its name had originally appeared in the place and stead of Gaylor on all such notes and deeds of trust.

### IV.

All litigation involving Tennant, Bye, Gaylor and Center, aforesaid, shall be dismissed on or before October 5, 1975, with prejudice and at the expense of the party initiating same.

On February 12, 1976, the Texas Court of Civil Appeals entered judgment dissolving the temporary injunction restraining Center as to tract C purchased by Hildebrand. On May 4, 1976, tract C was sold to Center at a foreclosure sale made pursuant to the June 28, 1974, note and deed of trust from Gaylor to Center.

On its 1975 consolidated return, Affiliated reflected the settlement with Gaylor by adjusting the selling prices and gross profit percentages on tracts A, B, and C and continuing to report those transactions as installment sales. Affiliated reported installment profit of $10,630 for tract A which left unreported profit of $190,126. Affiliated reported $11,065 installment profit for tract B which left unreported profit of $210,251. No collection had been made on tract C, and no installment profit was reported in 1975. After adjusting the selling price for the difference between the face amount of the Gaylor-to-Center note and the face amount of the Hildebrand note for tract C and adjusting for

$1,119 profit reported in 1974, unreported profit amounted to $280,233.

Respondent determined that Center had a total gain of $485,776 for 1975 from the disposition of installment obligations under section 453(d). This total gain is net of certain obligations assumed by Center under the several agreements. Consequently, the net operating loss carryback from 1975 to 1972 was similarly reduced.

OPINION

### 1. *The Post-Effective Amendments Issue*

Affiliated concedes that its "one-time expenses" for the preparation and filing of the SEC registration statement and prospectus for its public offering of security units consisting of stock and stock warrants are nondeductible. Affiliated contends, however, that its "annually recurring" expenditures · for the post-effective amendments to the statement and prospectus are deductible, if we understand the argument, under section 162(a) as ordinary and necessary expenses or under section 167(a) as the cost of a capital item which is exhausted in 1 year. To support this argument, petitioner relies heavily upon *Chesapeake Corp. of Virginia v. Commissioner*, 17 T.C. 668 (1951).

Respondent maintains that Affiliated's expenses for the preparation and filing of the post-effective amendments to the SEC registration were costs of raising equity capital. As such, according to respondent, the expenditures are not deductible under section 162(a) or amortizable under section 167(a) but are to be treated as a reduction of the capital proceeds.

We hold for respondent on this issue. We agree that Affiliated's expenditures for the post-effective amendments were incurred in the raising of capital and the issuance of its stock and, therefore, are not deductible under either section 162(a)[2] or section 167(a).[3]

[2] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

[3] SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

The general rule is that costs incurred by a corporation in issuing its capital stock are nondeductible. This rule has been applied in a variety of factual situations. In *Davis v. Commissioner*, 151 F.2d 441, 443 (8th Cir. 1945), affg. 4 T.C. 329 (1944), the court held that a taxpayer corporation could not amortize or deduct the cost, among other items, of complying with SEC regulations on the selling of its capital stock. In *General Bancshares Corp. v. Commissioner*, 326 F.2d 712 (8th Cir. 1964), affg. 39 T.C. 423 (1962), the court denied a deduction for the cost of issuing stock dividends. To the same effect, see *United Industrial Corp. v. Commissioner*, 331 F.2d 605 (6th Cir. 1964), affg. a Memorandum Opinion of this Court; *Arkansas Louisiana Gas Co. v. Commissioner*, 331 F.2d 850 (5th Cir. 1964), affg. per curiam a Memorandum Opinion of this Court. In *McCrory Corp. v. United States*, 651 F.2d 828, 835 (2d Cir. 1981), the capitalized costs of a merger attributable to the issuance of the stock of the acquiring corporation were held to be nondeductible expenditures. Such expenses are treated as the equivalent of selling the stock at a discount and the costs do not create an asset that is exhausted over the life of the corporation. See *Barbour Coal Co. v. Commissioner*, 74 F.2d 163, 164 (10th Cir. 1934), affg. a Memorandum Opinion of this Court; *Simmons Co. v. Commissioner*, 33 F.2d 75, 76 (1st Cir. 1929), affg. 8 B.T.A. 631 (1927); B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 5.07, at 5-28 (4th ed. 1979); sec. 1.248(b)(3), Income Tax Regs.

As we view the record, the costs of preparing and filing the post-effective amendments here in dispute were costs incurred by Affiliated in raising capital and issuing its capital stock and are, therefore, nondeductible. Under the provisions of the Securities Act of 1933, 15 U.S.C. sec. 77e-77j, when a corporation's "security" is to be offered for sale to the public, a registration statement (Form S-1) and prospectus are required to be filed with the SEC. The term "security" is defined to include any "stock" and any "warrant or right to subscribe to or purchase" any stock. 15 U.S.C. sec. 77b(1) (1982). After a registration statement

(1) of property used in the trade or business, or
(2) of property held for the production of income.

is filed, the financial and other information contained in the statement are required to be updated from time to time by the filing of so-called post-effective amendments. 15 U.S.C. sec. 77j (1982). Thus, after filing the Form S-1 with the SEC for the public offering of the stock and warrants, Affiliated was required to keep the publicly disclosed financial information up to date so that it would not be misleading to investors.

As detailed in our findings, on March 26, 1970, Affiliated offered 525,000 units of securities for sale at $20 per unit. Each unit consisted of 2 shares of Affiliated's common stock and one warrant to purchase 1 share of common stock at a price of $10 per share.[4] The warrants were originally scheduled to expire on March 26, 1975, but were later extended to March 26, 1977. Affiliated stock and the warrants were later traded on the over-the-counter market and, still later, on the American Stock Exchange. Affiliated incurred expenses in preparing the registration statement and prospectus (Form S-1) in compliance with the SEC regulations for the initial public offering and for post-effective amendments to the registration statement.

The original registration and prospectus were prepared and submitted to the SEC to enable Affiliated to raise capital through sales to the public of the 525,000 units of securities. Part of the capital raised from selling units of securities, consisting of 2 shares of common stock and 1 common stock purchase warrant, was attributable to the warrant included in each unit. When the warrants were exercised at that time or later, Affiliated issued its stock and received additional capital for its operations.

In our view, the issuance of the warrants followed by their exercise by their owners was as directly related to the raising of capital for Affiliated as the sale of the 2 shares of stock included in each unit, sold pursuant to the original registration statement and prospectus. In fact, the SEC regulations (17 C.F.R. ch. II, sec. 229.512(a)(2) (1980)) provide:

---

[4]The warrants provided for an adjustment of the purchase price and the number of shares of common stock issuable upon the exercise thereof. The post-effective amendments No. 2 and No. 3, dated May 2, 1972, and Nov. 13, 1972, state that each warrant entitles the holder to purchase 1.0983 shares of common stock at a price of $9.105 per share.

(2) That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

Affiliated's post-effective amendment costs as well as its original registration statement costs were thus incurred in connection with the issuance of its stock for capital and, under the general rule discussed above, are not deductible.

Contrary to the factual premise for Affiliated's amortization argument, filing post-effective amendments with the SEC is not simply an annual requirement. At least three situations require such amendments to be filed so that investors will not be misled. First, section 10(a)(3) of the Securities Act of 1933 (15 U.S.C. sec. 77j(a)(3) (1982))[5] provides that, anytime after 9 months subsequent to the effective date of a registration statement, the prospectus can no longer be used if any information in the prospectus is over 16 months old. In such circumstances, the prospectus must be updated. Second, when facts or events which individually or in the aggregate represent a fundamental change in the information set forth in the registration statement occur, the statement must be updated.[6] Third,

---

[5] 15 U.S.C. sec. 77j(a) (1982) provides as follows:

SEC. 77j. Information required in prospectus

(a) Except to the extent otherwise permitted or required pursuant to this subsection or subsections (c), (d), or (e) of this section—

(1) a prospectus relating to a security other than a security issued by a foreign government or political subdivision thereof, shall contain the information contained in the registration statement, but it need not include the documents referred to in paragraphs (28) to (32), inclusive, of schedule A of section 77aa of this title;

\*       \*       \*       \*       \*       \*       \*

(3) notwithstanding the provisions of paragraphs (1) \* \* \* of this subsection when a prospectus is used more than nine months after the effective date of the registration statement, the information contained therein shall be as of a date not more than sixteen months prior to such use, so far as such information is known to the user of such prospectus or can be furnished by such user without unreasonable effort or expense;

[6] In *Securities and Exchange Commission v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1095-1096 (2d Cir. 1972), the court, holding that failure to update a prospectus was fraudulent to investors, stated:

"Post-effective developments which materially alter the picture presented in the registration statement must be brought to the attention of public investors. 'The effect of the antifraud provisions of the Securities Act \* \* \* is to require the prospectus to reflect any post-effective changes necessary to keep the prospectus from being misleading in any material respect.\* \* \*' SEC v. Bangor Punta Corp., 331 F. Supp. 1154, 1160 n. 10 (S.D.N.Y. 1971). *Accord,* Danser v. United States, 281 F.2d 492, 496-97 (1 Cir. 1960). See 1 Loss Securities Regulation 293 (2d ed. 1961, Supp. 1969). [Fn. ref. omitted.]"

any material change in the information relating to the plan of distribution, including any addition or deletion of a managing underwriter other than a co-manager requires a post-effective amendment. These requirements are qualified by a proviso that post-effective amendments are required only when offers or sales are being made; when sales are not being made, investors are not misled.[7]

In view of these requirements with respect to post-effective amendments, we do not agree with the factual premise underlying Affiliated's argument that the expenditures incurred in preparing such amendments are amortizable under section 167(a) as a capital item which is exhausted in 1 year. Nonetheless, we recognize that registration statements and prospectuses eventually become stale upon the expiration of time, if not annually, and must be updated from time to time as long as the securities described therein are being sold. Even so, *Chesapeake Corp. of Virginia v. Commissioner*, 17 T.C. 668 (1951), does not aid Affiliated's cause.

In the *Chesapeake* case, this Court held that a fee paid annually to maintain the listing of stock on the New York Stock Exchange was currently deductible. The Court reasoned that, although the cost of listing a stock on the exchange is a nondeductible capital expense because the listing is for an indefinite period (*Dome Mines, Ltd. v. Commissioner*, 20 B.T.A. 377, 378 (1930)), the annually recurring cost of maintaining the listing, even if a capital expenditure, is for a capital item which is exhausted within 1 year. On that ground, the Court allowed a deduction for the annual fee.

Trading of a corporation's outstanding stock on a stock exchange, however, does not involve the raising of capital for the corporation through the issuance of its stock. The listing of stock on an exchange is an accommodation of the

---

[7]H. Bloomenthal, Securities Law Handbook, sec. 6.17[2], at 164 (1986-1987 ed.):

"It should be noted that post-effective amendments are required only 'during any period of time in which offers or sales are made.' Rule 512(a)(1). To the extent the 'offering' is still on standby, there is no need to file a post-effective amendment notwithstanding the fact, for example, that there have been fundamental changes in the information set forth in the prospectus. Even if technically there is a present offer, as in the case of the registration of shares underlying presently exercisable warrants, if the discrepancy between market price and exercise price makes it extremely unlikely that the warrants will be exercised, post-effective amendments need not be filed. [Fn. ref. omitted.]"

shareholders in that it provides a broader market for their stock. Like other stockholder relations expenses, such as annual reports and proxy solicitations, the annual cost of maintaining the listing is a deductible corporate expense. B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 50.4, at 5-17 n. 42 (4th ed. 1979).[8]

We hold that Affiliated's expenses in 1972 and 1975 in preparing and filing the post-effective amendments are not deductible.

## 2. *The Installment Obligation Issue*

Respondent contends that, under section 453(d), Center's acceptance of Gaylor's assignment to it of the Bye, Tennant, and Hildebrand notes and the elimination of Gaylor as payor of the notes caused Center to recognize gain from the satisfaction or other disposition of the Gaylor-to-Center notes of June 28, 1974. On that ground, respondent contends that Center is required to recognize as income for 1975 the amount by which the Bye, Tennant, and Hildebrand notes exceeded Center's adjusted basis for the Gaylor-to-Center notes on tracts A, B, and C.

Petitioners contend that section 453(d) is intended to require recognition of gain only when a seller cashes in on an installment obligation, either by satisfaction, sale, or other disposition of the obligation. This principle, petitioners argue, cannot be applied where, as part of the settlement of a lawsuit, a subsequent purchaser's nonrecourse obligation is substituted for or includes the first purchaser's substantially identical nonrecourse obligation, both of which obligations are secured by deeds of trust liens on the same property. On this ground, petitioners maintain that Gaylor's assignment of the Bye, Tennant, and Hildebrand notes to Center did not cause a disposition or satisfaction of

---

[8]In Rev. Rul. 65-13, 1965-1 C.B. 87, the Internal Revenue Service ruled expenses incurred in obtaining and filing semi-annual reports required by the SEC in connection with an employee stock option offering are deductible as ordinary and necessary business expenses. Employee stock options, however, are compensation related whereas the warrants in this case were designed and used as a means of raising capital for Affiliated. The ruling has no applicability to this case.

Gaylor's notes to Center within the meaning of section 453(d).[9]

We hold for petitioner on this issue.

In the form in which it was in effect for 1975, section 453(a) and (b) permits a taxpayer to elect the installment method of reporting gain from the sale of real estate. Under this method, a taxpayer may report as gain a fraction or proportionate part of the payments actually received in the taxable year. Section 453(d)[10] provides that, where the election is made and the obligation is later satisfied or disposed of, the entire amount of the deferred gain or loss resulting from the disposition of the obligation is recognized in the year of the disposition. As this Court has noted, the test is a practical one, namely whether there has been a discharge or "gainful disposition" of an installment obligation. *Cunningham v. Commissioner*, 44 T.C. 103, 108 (1965).[11]

By its terms, section 453(d) comes into play only when an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of by the creditor. In this case, Gaylor assigned his Bye, Tennant, and Hildebrand notes to Center. This assignment and related agreements eliminated Gaylor as "middleman," at least with respect to the Bye and Tennant notes. No longer would Gaylor collect payments on his notes and then make payments to Center. Instead, Bye and Tennant would make their payments directly to Center. No commitment in this respect was made by Hildebrand. The arrange-

---

[9]Petitioners also rely upon sec. 595 to relieve them of liability with respect to the Hildebrand note. We find it unnecessary to reach that argument.

[10]SEC. 453. INSTALLMENT METHOD.

(d) Gain or Loss on Disposition of Installment Obligations.—

(1) General rule.—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and—

(A) the amount realized, in the case of satisfaction at other than face value or a sale or exchange, or

(B) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange.

Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received.

(2) Basis of obligation.—The basis of an installment obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full.

[11]See also *Kutsunai v. Commissioner*, T.C. Memo. 1983-182; Rev. Rul. 82-122, 1982-1 C.B. 80.

ment did not constitute a disposition by Center of its rights as a creditor with respect to the Gaylor-to-Center notes and the related liens on tracts A, B, and C. As explained in *Wynne v. Commissioner*, 47 B.T.A. 731, 734 (1942), "a debtor can not sell or otherwise transfer its creditor's rights." The assignment did not, therefore, accelerate the tax otherwise due on Center's gain on the sale of the three tracts to Gaylor.

Respondent asserts, however, that in the assignment transaction Gaylor "was released of all liability with respect to his notes to Center" and Center's "acceptance" of the "assignment and release of Gaylor resulted in a disposition within the meaning of section 453(d) of the original installment obligations which it held." But respondent's argument overlooks at least two facts.

First, Gaylor's notes to Center were nonrecourse notes. They imposed on him an obligation to make the periodic installment payments to Center but no personal liability that could be enforced. The property alone was charged with the lien and was the sole source (apart from the $100,000 letter of credit which Gaylor had allowed to expire) from which the indebtedness could be collected or enforced. A personal judgment could not have been obtained against Gaylor for any deficiency following a foreclosure of the lien. See *Hilpert v. Commissioner*, 151 F.2d 929, 932 (5th Cir. 1945), revg. 4 T.C. 473 (1944). As explained by Frank Goldberg, the officer of Center who handled the compromise settlement negotiations with Gaylor, Center did not care who was the maker of the nonrecourse notes because Center "could only look to the property for payment anyway." There was no personal liability to satisfy the notes.

Second, when Gaylor assigned his Bye, Tennant, and Hildebrand notes to Center, Gaylor's notes to Center were not canceled, satisfied, or extinguished, and the Bye, Tennant, and Hildebrand notes were not accepted in lieu thereof. To the contrary, as stated in our findings, each of the three Bye, Tennant, and Hildebrand notes assigned to Center refers to the pertinent Gaylor-to-Center note as the "Existing Note." Each assigned note provides that the lien securing its payment is subordinate to the lien securing the

Existing Note and provides that the payee and subsequent holders "acknowledge that within the principal balance of this Note is the outstanding principal balance of the Existing Note."

The apparent purpose of including these provisions in the assigned notes was to preserve the additional security provided by the Gaylor-to-Center deeds of trust and to guard against possible encumbrances intervening between the recordation of the Gaylor-to-Center deeds of trust and the ones executed by Bye, Tennant, and Hildebrand. These provisions thus preserved the viability of the Gaylor-to-Center notes and the liens securing them. As stated in *Wynne v. Commissioner*, 47 B.T.A. at 735, it is "the disappearance of the installment obligation or its removal from the hands of the obligee that creates the occasion for invoking the provisions of section * * * [453(d)]." The Gaylor-to-Center notes and the liens securing them did not disappear in the transactions before the Court.

The September 19, 1975, memorandum of agreement settling the litigation between Center and Gaylor states that the settlement is subject to "Mutual complete releases executed by Center and Gaylor for any claim arising out of the sale of 3 tracts of land * * * on June 28, 1974." The releases are not in the record but the disputes that led to the litigation related to utilities and taxes on the three tracts and a $100,000 letter of credit that Gaylor had agreed to deposit with a local bank.

Given the explicit provisions in the notes, discussed above, we think it inconceivable that the releases satisfied Gaylor's nonrecourse notes to Center and the liens securing them. Our view in this respect is confirmed by Frank Goldberg's testimony that the liens created by the Gaylor-to-Center deeds of trust were, as recited in the notes themselves, superior to the liens Center obtained as a result of Gaylor's assignment of the Bye, Tennant, and Hildebrand notes to Center. Significantly, also, when Center foreclosed on tract C on May 4, 1976, because of the default in payment, the tract was sold pursuant to the deed of trust from Gaylor to Center and not pursuant to the Hildebrand deed of trust to Gaylor which Gaylor assigned to Center. To adopt respondent's version of the facts would

require a conclusion that Center foreclosed on a satisfied debt.

Although Hildebrand's name is included in some of the documents, he was not a party to the settlement between Center, Gaylor, Bye, and Tennant. He continued to pursue the litigation that had been instituted. Quite obviously Gaylor's assignment of the Hildebrand-to-Gaylor note to Center alone did not cause a satisfaction of Gaylor's note to Center or the lien covering tract C. *Wynne v. Commissioner, supra* at 734.

Because Gaylor no longer held the Bye, Tennant, and Hildebrand notes, those three individuals were obligated to pay Center the slightly greater annual installments on a somewhat larger liability at slightly different interest rates than provided in the Gaylor-to-Center notes. We do not think these alterations in the arrangement, however, effectuated a section 453(d) satisfaction or disposition of the Gaylor-to-Center notes. Further, even if any additional gain to Center was included in the larger principal and annual payments called for in the Bye, Tennant, and Hildebrand notes, we see no reason why such additional gain may not also be reported under the installment method.[12]

Respondent argues that *Burrell Groves, Inc. v. Commissioner*, 22 T.C. 1134 (1954), affd. 223 F.2d 526 (5th Cir. 1955), controls. In that case, the taxpayer corporation sold property to its shareholders for cash plus promissory notes and reported the sale on the installment basis. The shareholders resold the property to a partnership which, as part payment, issued notes both to the taxpayer and to its shareholders. The taxpayer then canceled the old notes from its shareholders, accepting in lieu thereof the partnership notes. Although the partnership's note was for the same principal amount, it had different amounts due on different dates and provided for different interest. The Court held that the installment obligations were "disposed of" within the meaning of section 453(d) through cancellation and satisfaction in exchange for the partnership note and that the deferred gain was taxable.

---

[12]See *Rhombar Co. v. Commissioner*, 47 T.C. 75, 84-85 (1966), affd. on other issues 386 F.2d 510 (2d Cir. 1967); Rev. Rul. 68-419, 1968-2 C.B. 196; Rev. Rul. 82-122, 1982-1 C.B. 80.

*Burrell Groves, Inc.* is not analogous, however, because the Gaylor-to-Center notes in the instant case were nonrecourse and were not canceled. They remained in effect as indebtedness secured by deeds of trust on the property and the assigned Bye, Tennant, and Hildebrand notes were not substituted for them. See and compare *Cunningham v. Commissioner*, 44 T.C. 103, 108 (1965).

We hold that the Gaylor-to-Center notes were not satisfied or disposed of within the meaning of section 453(d) when Center settled its controversy with Gaylor in 1975.

To reflect the foregoing,

*Decision will be entered under Rule 155.*