THE FIRST NATIONAL BANK IN ALBUQUERQUE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
First Nat'l Bank v. Commissioner
Docket No. 4878-86.
United States Tax Court
T.C. Memo 1988-516; 1988 Tax Ct. Memo LEXIS 542; 56 T.C.M. (CCH) 575; T.C.M. (RIA) 88516; November 7, 1988. *542 P, a bank, sold a building in Albuquerque to a partnership in exchange for cash and a promissory note. Thereafter, Albuquerque issued metropolitan redevelopment bonds to finance acquisition and redevelopment of the building. P, along with a correspondent bank, purchased all of the bonds. The bond proceeds were deposited in an account maintained by P as trustee. P, as trustee of the bond proceeds account, then paid the face value of the promissory note to itself as noteholder. Held, P disposed of the promissory note at face value and must recognize gain on the note consistent with I.R.C. section 453(d). John A. Budagher, for the petitioner. John S. Repsis, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Chief Judge: Respondent determined deficiencies in petitioner's income tax for the years 1980 and 1981 in the respective amounts of $ 382,415 and $ 75,699. Concessions having been made, the issue remaining for decision is whether tax-exempt bonds were substituted for the purchase money promissory note (the purchase note) in controversy or whether the purchase note was retired in a taxable event under section 453. [1] Only the 1980 deficiency is now in contention in this case. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits *544 attached thereto are incorporated herein by this reference. Petitioner, First National Bank in Albuquerque, is a corporation organized under the laws of the State of New Mexico. When the petition was filed, petitioner's principal place of business was Albuquerque, New Mexico. Petitioner owned the old First National Bank Building in Albuquerque (hereinafter called the building) from October 1, 1933, until it was sold on July 9, 1979. Petitioner's basis in the building at the time of sale was $ 323,477. The building is located in the Alvarado Metropolitan Redevelopment Area of downtown Albuquerque. The Alvarado district experienced severe urban decay in the mid-to-late 1970s. In 1978, Albuquerque targeted the blighted Alvarado district for economic renewal. Anticipating the economic opportunities inherent in Albuquerque's plans, two real estate developers, Joe Fritz (Fritz) and John Binford, began preliminary negotiations with petitioner in September, 1978, for the purchase and redevelopment of the building. In November, 1978, voters of Bernalillo County, in which Albuquerque sits, rejected county plans to acquire and renovate the building. Public rejection of county *545 acquisition cleared the way for private investment. After the county vote Fritz, as general partner, and others formed the Old Bank limited partnership (the partnership) to acquire, redevelop and operate the building. William H. Oldaker (Oldaker), an experienced Albuquerque bond lawyer, informed Fritz of the possibility of using low cost municipal bond financing for the acquisition and renovation of the building. Oldaker was familiar with pending state legislation referred to as Metropolitan Redevelopment Code of the State of New Mexico (hereinafter called redevelopment code). The redevelopment code proposed to allow private entities to use tax-exempt bond financing to redevelop blighted urban areas within the confines of section 103. 1979 N.M. Laws 391. The redevelopment code was enacted by the New Mexico legislature in March, 1979, and became effective on July 1, 1979. 1979 N.M. Laws 391. The bond issuance in contention was the first of its kind in New Mexico under the new redevelopment code. Sale of the Building
In December, 1978, Fritz, on behalf of the partnership, acquired a renewable option for the purchase of the building from petitioner. Fritz, on behalf *546 of the partnership, made approximately $ 14,000 in option payments to petitioner from December 12, 1978, to July 9, 1979. On March 28, 1979, the partnership notified petitioner of its intent to exercise the option. The partnership intended to acquire and renovate the building with tax-exempt municipal financing. The lower interest rate afforded by tax-exempt status and a 33-year repayment period made municipal bond financing the most economical method of acquiring and rehabilitating the building. On June 14, 1979, immediately before the effective date of the redevelopment code, petitioner and the partnership entered into a purchase agreement which provided that petitioner would sell the building and its underlying real estate to the partnership for $ 1,735,000. The purchase agreement specified interim financing for acquiring and renovating the building. The interim financing consisted of a $ 1,335,000 nonrecourse subordinated purchase money promissory note (the purchase note) and a $ 3,065,000 construction loan promissory note (the construction note). The record is not clear as to the amount of construction funds advanced to the partnership. The purchase note and construction *547 note were intended to provide financing until bonds were issued and proceeds became available or in the alternative long-term conventional financing was needed. The purchase agreement contemplated "alternative long term, non-recourse financing arrangements to finance the purchase the purchase price of the building and rehabilitation costs." The two alternative forms of long term financing were: (1) conventional financing with an annual interest rate of ten percent, or (2) tax-exempt municipal bond financing with a maximum interest rate of seven and one-half percent with bond maturities from one to thirty-three years. Thus, the parties viewed the notes as merely a temporary measure until permanent financing could be secured in either bond or conventional form. On July 9, 1979, petitioner conveyed title in the building to the partnership under the terms of the purchase agreement for a $ 400,000 cash down payment and the purchase note. The purchase note structured payments as follows: (1) accrued interest at nine percent payable on the earlier of December 14, 1980, or the completion of rehabilitation, (2) principal and interest in 180 equal monthly installments of $ 10,560.32 *548 beginning the earlier of January 1, 1981, or the first day of the first month after completion of rehabilitation, and (3) one final balloon payment of $ 1,136,159.51 on the first day of the 181st month. The purchase note was secured by a mortgage on the building. Petitioner is an accrual basis taxpayer. In 1980 petitioner elected to report gain from the sale on the installment method under section 453. Petitioner sold the building to the partnership prior to availability of long-term bond financing because: (1) petitioner needed to rapidly dispose of the building to comply with the state comptroller's office rules on bank ownership of real property; (2) the partnership wanted to stop making costly option payments which were not being credited towards the final purchase price; and (3) rising inflation rates made it imperative for the partnership to quickly accept a bid submitted by a construction firm for a fixed price rehabilitation contract before the bid was cancelled. Bond Financing Mechanism
The redevelopment code required the partnership and Albuquerque to "jump through a series of hoops" imposed by the state to qualify for municipal bond financing. The building *549 was placed on the National Registry as a certified historic structure. The partnership appeared before the City Council of Albuquerque, seeking a resolution expressing Albuquerque's intent to issue redevelopment bonds in order to induce the partnership to acquire and renovate the building. On May 1, 1980, long-term financing was provided by proceeds from the contemplated tax-exempt Albuquerque bond issuance. Petitioner and the First National Bank in Dallas (the Dallas bank) were the sole purchasers of the issue. Legal lending limitations prohibited petitioner from purchasing bonds in excess of $ 3,600,000. The Dallas bank, a correspondent bank, agreed to buy the remaining $ 800,000 of bonds required to finance the project. The Dallas bank predicated its purchase upon a "last-in first-out" condition, i.e., the Dallas bank was to receive interest and principal bond payments before petitioner received any principal payments in 1995. However, interest payments to petitioner commenced on May 1, 1981, and ran concurrently with those of the Dallas bank. The bond indenture specified this seniority scheme in the case of partial redemption. The only security for payment of the bonds *550 consisted of a mortgage and indenture of trust (the indenture) executed on May 1, 1980. The partnership transferred title to the building to Albuquerque and subsequently entered into a long-term leaseback agreement (the lease). The indenture pledged all partnership lease payments to a bond fund account maintained by petitioner as trustee. The bond fund in turn paid interest and principal on the bonds to petitioner, as bondholder. Albuquerque's only liability extended to the mortgage on the building. Albuquerque issued the bonds on May 1, 1980. Petitioner purchased 33-year bonds with an aggregate face amount of $ 3,600,000 and an annual interest rate of seven and one-half percent. The Dallas bank purchased the remaining $ 800,000. The record indicates, however, that petitioner issued two checks in the respective amounts of $ 3,600,000 and $ 800,000. It is a reasonable assumption from the entire record that the check for $ 800,000 represents the Dallas bank's purchase. Petitioner's two checks totalling $ 4,400,000 were deposited in the acquisition fund, an account maintained by petitioner as trustee for Albuquerque. The acquisition fund formed the repository of acquisition *551 and rehabilitation monies. The bond proceeds deposited in the acquisition fund were then used to liquidate the purchase note, in the amount of $ 1,335,000, and to finance rehabilitation of the building. Section 3.11 of the indenture explicitly directs petitioner as trustee of the acquisition fund to expend the bond proceeds as directed in section 4.4 of the lease. Section 4.4(j) of the lease directs liquidation of the purchase note with bond proceeds. As discussed above, pursuant to the bond financing, the partnership conveyed title to the building toe Albuquerque and leased the building back from Albuquerque. The lease payments went to a second account (the bond fund) maintained by petitioner as trustee, wearing yet another of its many hats. The lease payment exactly equaled the amounts required to meet the principal and interest payments on the bonds. The lease payments followed through the bond fund and into petitioner's own account as bond payments. The partnership expensed the interest portion of the lease payments and depreciated the building on a 32-year life under the straight line method. Further agreements provided for a return to the partnership of title to the *552 building upon final bond payout in 2013 through exercise of an option to purchase the building for $ 1,000. OPINION On July 1, 1979, New Mexico's redevelopment code became effective. The redevelopment code authorized municipalities to issue metropolitan redevelopment bonds with the aim of stimulating private investment in blighted urban areas. Petitioner wanted to sell a building that it owned in a blighted area of Albuquerque. On July 9, 1979, petitioner sold the building to a partnership formed for the purpose of acquiring and redeveloping the building. The building qualified for tax-exempt financing under the redevelopment code. The partnership and petitioner intended to finance the acquisition and renovation of the building with tax-exempt bonds issued by Albuquerque under the auspices of the new redevelopment code. However, this was the first bond issuance under the new redevelopment code and it was not clear when the bond financing would become available. The partnership and petitioner were unwilling to wait until the desired tax-exempt financing became available because: *553 (1) petitioner, as a bank, was under pressure from the comptroller of the State of New Mexico to divest itself of the building; (2) the partnership was tired of paying the monthly renewal fee on an option to purchase the building; and (3) the partnership desired n disposition occurred within the intent of section 453(d). [2] Rather, petitioner argues under two distinct theories, the step transaction and substitution theories, that the "substitution" of the purchase note "was merely an internal progression" which should be ignored. Respondent counters that a portion of the bond proceeds directly satisfied the full face value of the purchase note; thus the deferred gain should be recognized under section 453(d). We agree with respondent. *554 The law has been well established for over 50 years regarding the tax treatment of cash dispositions of installment obligations commencing with the Board of Tax Appeal's opinion in Thos. Goggan & Bro. v. Commissioner,45 B.T.A. 218, 222 (1941). As we have found the facts, the case before us is straightforward and rests on a firm legal foundation. Petitioner argues that the transaction centered on a substitution of bonds for the purchase note. Petitioner then concludes that section 453(d) does not apply in this case. However, the record does not support petitioner's description of the transaction. We conclude, after consideration of the entire record, that petitioner disposed of the purchase note by satisfying it with a part of the bond proceeds, as respondent maintains.
Respondent's determinations in the statutory notice of deficiency are presumptively correct and petitioner bears the burden of proving otherwise. Rule 142(a). Petitioner raises two argument in attempting to rebut respondent's determination under section 453(d): (1) the step transaction doctrine and *555 (2) the substitution theory. The step transaction doctrine is based upon Kimbell-Diamond Milling Co. v. Commmissioner,14 T.C. 74 (1950), affd. per curiam 187 F.2d 178 (5th Cir. 1951), cert. denied 342 U.S. 827 (1951). Kimbell-Diamond involved a multiple step stock purchase and liquidation. Under an overall plan to acquire assets, the purchaser effectively collapsed the steps to acquire the corporate assets tax-free. Petitioner first bases its application of the step transaction doctrine on the view that the bonds were substituted for the purchase note, and then concludes that the substitution, as an intermediate step on the way to long-term bond financing, should be "collapsed" tax-free. See Stuetzer, Installment Sales under the 1954 Code: A Critical Analysis, 13 N.Y.U. Annual Institute on Federal Taxation 1215, 1228-1230 (1955). Petitioner's second argument is likewise predicated upon a substitution view of the transaction. The substitution argument posits that the purchase note was merely substituted by another obligation and as such petitioner has not realized any income from the underlying note and therefore should *556 not incur tax. In making this argument petitioner analyzes an extensive list of cases. See, e.g., Cunningham v. Commissioner,44 T.C. 103 (1965); Burrell Groves, Inc. v. Commissioner,22 T.C. 1134 (1954), affd. 223 F.2d 526 (5th Cir. 1955); Kutsunai v. Commissioner,T.C. Memo. 1983-182. As indicated, petitioner bases application of both the step transaction and substitution theories on the view that petitioner substituted bonds for the purchase note. We find petitioner's premise incorrect. The bonds were not substituted for the purchase note. Instead, petitioner used $ 1,335,000 of the bond proceeds to satisfy the purchase note. Our conclusion is fully supported by the record. Luther W. Reynolds (Reynolds), a member of the board of directors of petitioner and the chief financial officer of the Maloof Company, which owned the controlling interest in petitioner, testifed on cross examination that "This note [purchase note] was paid off with the bond proceeds." Reynolds further responded affirmatively when asked if petitioner received the "physical cash" contemplated by the purchase note from the bond proceeds. *557 We find Reynolds' testimony forthright and persuasive. Other evidence in the record corroborates Reynolds' testimony. Section 3.11 of the indenture explicitly directs petitioner as trustee of the acquisition fund to expend the bond proceeds as directed in section 4.4 of the lease. Section 4.4(j) of the lease directs "Payment of amounts necessary to liquidate the Outstanding Obligations * * *." "Outstanding Obligations" are defined in the lease as "the obligations of the Lessee described in Exhibit B hereto to be liquidated with a portion of the proceeds of the Series 1980 Bonds deposited in the Acquisition Fund." The purchase note and the construction note are found in Exhibit B. Reynolds' testimony leads us to conclude that petitioner carried out the directions of the indenture and lease. Petitioner did not "substitute" the bonds for the purchase note, but liquidated it with "physical cash" from the bond proceeds. In actuality there was no substitution of bonds for the purchase note to support application of petitioner's theories. See Commissioner v. National Alfalfa Dehydrating & Milling Co.,417 U.S. 134, 149 (1974). Petitioner would have us alter the *558 form of the transaction into a substitution to reach these theories. As the Supreme Court said there, "This Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not." Petitioner chose to follow the route of liquidating the purchase note with bond proceeds and "he must accept the tax consequences of his choice." Moreover, petitioner had a heightened awareness of the multiple Federal, state and local tax consequences of the sale and redevelopment of the building. The record establishes that petitioner and the partnership structured the purchase and redevelopment in the foregoing manner in an attempt to: (1) obtain tax-exempt financing for both acquisition and renovation, (2) avoid both property taxes on the building and local sales tax on the items purchased for redevelopment by having title of the building remain in Albuquerque, (3) allow *559 the partnership to expense the interest portion of each lease payment and depreciate the building, and (4) allow petitioner to receive tax-exempt income on both the sale and redevelopment funds that it lent through the mechanism of the bond issuance. We do not suggest abuse. Nevertheless, in light of petitioner's demonstrated awareness of the tax consequences of this project, it would be inconsistent to hold that petitioner may avoid the burdens of the route it chose, while simultaneously enjoying the multiple benefits. It is a basic tenet of income taxation that income is realized when there is a cash liquidation at face value of an installment obligation. Burrell Groves, Inc. v. Commissioner,22 T.C. 1134, 1136 (1954), affd. 223 F.2d 526 (5th Cir. 1955). See Roche, Dispositions of Installment Obligations, 41 Tax L.Rev. 1, 5 n.14 (1985). This tenet is dually grounded in an accretion to wealth theory and in the assumption that once the taxpayer has been paid for the note he has the ability to pay the tax liability. By liquidating the purchase *560 note, petitioner has both experienced an accretion to wealth and has obtained the wherewithal with which to pay the tax liability. Petitioner contends on brief that to find for respondent would "stretch the confines of Section 453(d) beyond its intended reach and to unduly burden and restrict the exercise of good business judgment, as well as to limit the flexibility and imagination which manage to achieve such admirable public goals such as urban renewal within the economic realities of the business world." We do not agree. As stated at the outset, the income tax consequences of cash liquidations of installment notes have been well established for well over 50 years. See Thos. Goggan & Bro. v. Commissioner, supra.It is only the convoluted nature of the transactions surrounding the liquidation of the purchase note, structured in large part by petitioner, that might on its face appear to have created a pitfall for the well-intentioned urban renewer. The facts of this case are likely to by atypical, and we are not persuaded that the holding will deter investment in urban renewal under section 103. Moreover, the holding in this case is well within "the confines *561 of Section 453(d)" as it was originally envisioned by Congress, petitioner's argument to the contrary notwithstanding. In his notice of deficiency, respondent based his deficiency determination upon the theory that the entire proceeds of the bond issue were received by petitioner and applied by it to satisfy various obligations. To reflect the holding herein that only an amount of proceeds sufficient to satisfy the purchase note were applied, a recomputation will be required. To reflect the foregoing and concessions, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 in effect during the years in question. Similarly, unless stated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Section 453(d) provided in pertinent part: (d) GAIN OR LOSS ON DISPOSITION OF INSTALLMENT OBLIGATIONS. -- (1) GENERAL RULE. -- If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and -- (A) the amount realized, in the case of satisfaction at other than face value or a sale or exchange, or (B) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange. Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received. (2) BASIS OF OBLIGATION. -- The Basis of an installment obligation shall be the excess of the face value of the obligation over the amount equal to the income which would be returnable were the obligation satisfied in full.↩